# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil no. 2:11-cv-455-NT |
| | ) |
| CONAGRA GROCERY PRODUCTS, | ) |
| COMPANY, LLC | ) |
| | ) |
| Defendant | ) |

## ORDER ON PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS

Before the Court is Plaintiff United States of America's (the "**Government**") motion to dismiss (ECF No. 117) Defendant Conagra Grocery Products, Co., LLC's ("**Conagra**") counterclaims against the Government for contribution and declaratory judgment (ECF No. 112). The Government asserts that dismissal is required because the Court lacks subject-matter jurisdiction of the counterclaims and because the counterclaims fail to state claims for which relief may be granted. Fed. R. Civ. P. 12(b)(1) and (6). For the reasons that follow, the Government's motion is **GRANTED**. The Court has also reviewed Conagra's motion for leave to file a sur-reply (ECF No. 132), the proposed sur-reply (ECF No. 133), and the Government's opposition to Conagra's motion to file a sur-reply (ECF No. 138). Conagra's motion to file a sur-reply is **GRANTED** in that the Court has considered its contents, although the sur-reply does not alter the outcome on the Government's motion.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On November 29, 2011, the Government filed a complaint against Conagra under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 ("**CERCLA**"). The Complaint seeks recovery for costs the United States Environmental Protection Agency ("**EPA**") incurred for cleanup of hazardous waste at the site of a former tannery in South Paris, Maine. The Government claims that Conagra is a successor-in-interest to the company, Estech, Inc., which allegedly owned and operated the tannery that produced the waste.

On March 1, 2012, Conagra filed its answer, but, on August 1, 2012, it moved to amend this answer to include counterclaims alleging that the Government is responsible for contamination in the area of the tannery. On January 29, 2013, the Court granted in part Conagra's motion to amend its answer to assert a counterclaim, and, on February 5, 2013, Conagra filed its counterclaims against the Government for CERCLA contribution and declaratory judgment pursuant to 42 U.S.C. §§ 9607 and 9613.

Conagra asserts that, in 1973, the Government financed and permitted the development of a waste water treatment facility that allowed the Paris, Maine Utility District ("**PUD**") to dispose of hazardous waste onto property that is the subject of the Government's claim in this case.[1] Conagra alleges that the

---

[1] The complaint defines the "Site" that was the subject of its removal action as "an area of former settling lagoons used to collect tannery waste . . . located in South Paris, Oxford County, Maine," which is "bounded to the east by Oxford Street, to the north by the Little Androscoggin River, to the west by a railroad right of way, and to the south by a residential development." Compl. ¶¶ 8-9, ECF No. 1. Conagra asserts in its counterclaim that "[t]he Site alleged in USA's Complaint is

Government engaged in "affirmative misconduct" including threatening to withhold 50% of the federal funding for PUD's waste water treatment facility (the "**PUD Facility**") if "its demands for revisions to" an agreement between PUD and Estech were not met. Countercls. ¶¶ 11 and 14. Although Conagra provides no details regarding the nature of this agreement or of the revisions allegedly demanded by the Government, the Court infers that the agreement had something to do with disposal of waste from the PUD Facility onto Estech's property.

Meanwhile, according to Conagra, Maine's Department of Environmental Protection ("**MEDEP**") was opposed to construction of the PUD Facility, concerned that the permeable soils in the area were ill-suited to contain the waste water effluent to be produced at the facility. Despite MEDEP's objections, and allegedly due to the Government's funding and approval, the PUD Facility was built and began operating.

Conagra asserts that in March of 1976, the Government reviewed, approved, and ratified agreements between Estech and New Lawrence, which transferred ownership and operation of the tannery and its surrounding parcels of land from Estech to New Lawrence. In 1976, the Government is also alleged to have begun

---

located on property owned by A.C. Lawrence Leather Co., Inc. ('New Lawrence')" and that hazardous waste was deposited onto "multiple sources" within New Lawrence's property, all of which Conagra thereafter defines as the "Site" or the "Property." Countercls. ¶ 10 (ECF No. 112).

The Government complains that Conagra's vague allusions to "some undefined larger property" make it impossible for the Government "to discern what actions the United States took that contributed to the contamination." Mot. to Dismiss Countercls. 12 (ECF No. 117). But it is at least clear that the contamination Conagra wishes to place at the Government's doorstep came from PUD's waste water treatment facility. The Court fails to see how Conagra's expansion of the definition of the property at issue makes it impossible for the Government to determine what actions it was alleged to have taken. Also, Conagra's expanded definition of the "Property" does not *exclude* the site of the settling lagoons. Given the alleged proximity of the operations of the PUD facility and

3

"carrying out an Environmental Impact Statement on PUD's waste water sludge disposal activities" that resulted in the Government notifying PUD in December of 1978 that it had failed to observe the Government's permit requirements. Countercls. ¶ 20. Conagra faults the Government for nevertheless agreeing in June of 1979 to fund the design and construction of a new temporary sludge storage facility "[d]espite [its] knowledge of the severe contamination the waste water sludge was causing at, in, on and under the Property . . . ." Countercls. ¶ 25. MEDEP is alleged to have continued its efforts to stop PUD's contamination, issuing an order in November of 1979 that concluded that PUD's sludge disposal threatened public and private water supplies.

According to Conagra, the Government in December of 1982 indicted New Lawrence and five of its officers for environmental crimes, and in August of 1984, again notified PUD that it was violating the limits of its permit for disposal of biochemical oxygen demand, total suspended solids, and chromium. Conagra asserts that the Government "threaten[ed] to issue an Administrative Order,"–presumably against PUD—but concluded that a consent agreement that PUD was negotiating with MEDEP would, if signed, "satisfy USA's requirements that an appropriate enforcement action was being taken against PUD to eliminate its Permit violations." Countercls. ¶ 30. Conagra then asserts, without further elaboration, that "because of USA's activities, the Property continued to be used to dispose of PUD's waste water sludge." Countercls. ¶ 31. Conagra's factual

---

the tannery, it is plausible to infer under a Rule 12(b)(6) standard that some of the PUD facility's alleged contamination might have been present in the settling lagoons.

allegations conclude with the assertion that the Government participated in discussions that resulted in the entry of a consent decree between the State of Maine, MEDEP, and PUD on April 26, 1993. The counterclaim fails to allege what the content of the consent decree was.

Based on these allegations, Conagra asserts that the Government is liable under 42 U.S.C. § 9607 as either an "operator" of a facility where hazardous substances have been deposited, or as an "arranger" of the disposal of hazardous substances. The Government contends that it has not waived its sovereign immunity to suit, and that in any event, the allegations in the counterclaim fail to state a claim for "operator" or "arranger" liability.

## LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) and 8(d)(1). The First Circuit recently observed:

> To survive a motion to dismiss for failure to state a claim, a complaint need not present "detailed factual allegations," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007), but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). The precise parameters of the plausibility standard are "still a work in progress," *Menard v. CSX Transp., Inc.,* 698 F.3d 40, 45 (1st Cir. 2012), but, at bottom, a complaint's non-conclusory factual content must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal,* 556 U.S. at 663. An "unadorned, the-defendant-unlawfully-harmed-me accusation" will not do. *Id.* at 678.

*Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 638-39 (1st Cir. 2013) (alteration in original).

## DISCUSSION

I. **SOVEREIGN IMMUNITY**

CERCLA contains a waiver of sovereign immunity for the federal government:

> Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

42 U.S.C. § 9620(a)(1). The Government contends that this waiver does not extend to its "regulatory and environmental response activities," and that it remains immune from suit for any such activities. Conagra, quoting a Third Circuit case, contends that

> the government can be liable when it engages in regulatory activities extensive enough to make it an operator of a facility or an arranger of the disposal of hazardous wastes even though no private party could engage in the regulatory activities at issue.

*FMC Corp. v. U.S. Dep't of Commerce*, 29 F.3d 833, 840 (3d Cir. 1994).

The First Circuit has not yet addressed this issue but the Court finds the reasoning in *FMC Corp.* and in subsequent cases including *East Bay Mun. Util. Dist. v. United States Dep't of Commerce*, 142 F.3d 479, 481 (D.C. Cir. 1998) and *United States v. Shell Oil Co.*, 294 F.3d 1045, 1053 (9th Cir. 2002) persuasive. These cases hold that "the waiver of immunity contained in § 9620(a)(1) is coextensive

with the scope of the substantive liability standards of CERCLA." *East Bay Mun.*, 142 F.3d at 481. In other words, "[i]f § 9607 provides for liability, then § 9620(a)(1) waives sovereign immunity to that liability." *Shell Oil*, 294 F.3d at 1053. Because the Government has waived its immunity to suit for CERCLA liability, the Court proceeds to consider whether Conagra's counterclaims state a plausible claim for such liability.

## II. CERCLA LIABILITY

The First Circuit has explained that:

In passing CERCLA, Congress "'intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.'"

*United States v. Gen. Elec. Co.*, 670 F.3d 377, 382 (1st Cir. 2012) (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986)). CERCLA creates liability for costs of environmental remediation for:

> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [and]
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . .

42 U.S.C. § 9607(a). Conagra's counterclaim for contribution based on operator liability arises under subsection (2), and its claim for contribution based on arranger liability arises under subsection (3).

7

### A. Operator Liability

We begin with the understanding that the Government is not alleged to have owned the PUD Facility or any of the former tannery's property. Rather, Conagra claims that the Government "operated" the PUD Facility by financing its development, permitting its operations, and making demands of PUD regarding its agreement with New Lawrence.

*1. The Standard for Operator Liability*

Conagra relies on facially broad language in *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998), to assert that the above-alleged actions subject the Government to operator liability. Under *Bestfoods*, to state a claim for operator liability, Conagra must allege that the Government "directs the workings of, manages, or conducts the affairs of a facility," specifically those affairs "having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S at 66-67.

*Bestfoods* dealt with the liability of a parent corporation for pollution attributable to its subsidiary. In that context, the Supreme Court observed:

> "[A]ctivities [of the parent company or its agents] that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." Lynda J. Oswald, *Bifurcation of the Owner and Operator Analysis under CERCLA*, 72 Wash. U.L.Q. 223, 282 (1994). The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

*Bestfoods*, 524 U.S. at 72. Extrapolating from this discussion, the appropriate inquiry on this motion to dismiss is whether the Government's actions directed at the PUD Facility were plausibly alleged to have been eccentric under accepted norms of regulatory oversight. *See id.* If the Government is merely alleged to have taken actions consistent with a traditional regulatory role, the counterclaim cannot survive. *See United States v. Township of Brighton*, 153 F.3d 307, 316 n.11 (6th Cir. 1998) (applying *Bestfoods*, the "dispositive question" is "whether the government was running the facility or merely regulating it").

The cases cited by Conagra support the proposition that the Government may be liable for "operator" liability only if it steps outside of the "accepted norms" of its regulatory role. In these cases, the Government became involved with polluting facilities during a time of war, and required these facilities to make, for the Government's benefit, the products that generated the pollution at issue.[2] *See, e.g. FMC Corp.,* 29 F.3d at 842-46. In *FMC Corp.*, the Government needed high-tenacity rayon to make airplane and truck tires during World War II, and it commissioned a textile rayon company to convert its plant to produce the high-tenacity rayon. The Government provided and installed new equipment at the plant, provided raw materials, provided labor and on-site managerial personnel, and purchased almost all of the product manufactured at the facility. The Third Circuit held that this

---

[2] Conagra also cites *Nu-west Mining Inc. v. United States,* 768 F. Supp. 2d 1082, 1088-91 (D. Id. 2011) in support of its operator liability claim. But in this case, the United States was found to have operator liability with respect to mines which the government owned. The Government was never an owner in the instant case.

9

conduct gave rise to CERCLA operator liability for the Government. *FMC Corp.*, 29 F.3d at 846.[3]

## 2. *Applying the Operator Liability Standard*

In this case, the Government did not own the tannery, did not direct the tannery regarding the products it was to produce, and was not purchasing the end-products manufactured by New Lawrence. The Government may have financed and permitted the operations of the PUD Facility, but it is not alleged to have had any control over or interest in whether the PUD Facility ever actually opened its doors and began doing business. It is not alleged to have designed or staffed the facility, or to have negotiated contracts for waste water treatment. Although the counterclaims allege that the Government provided permit requirements to the PUD Facility, the PUD Facility—all on its own—is alleged to have exceeded those requirements. Neither the Government's alleged failure to stop the PUD Facility from exceeding its permit requirements, nor its decision to fund and permit an additional temporary sludge storage facility are equivalent to "direct[ing] the

---

[3]  Often, even under extenuating wartime circumstances, courts have concluded that the Government did not act as an operator for CERCLA purposes. *See East Bay Mun. Util. Dis.* 142 F.3d at 486-87 (D.C. Cir. 1998) (U.S. not an operator under CERCLA though it financially backed a mine, established price incentives, lowered mine's opportunity costs by price and labor regulation, and where it had authority to restrict gold mining and to seize the mine if owner refused to supply zinc needed for armaments); *Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1127-1131 (D. Id. 2003) (U.S. not an operator during WWII though it was involved in a joint undertaking with mine operators to produce metals essential for the war effort, even though government controlled the price of the product, wages, and work conditions; approved capital improvements, equipment and chemicals needed for processing; provided soldiers for security and labor; provided financing and financial oversight; and threatened seizure if certain conditions were not met); *United States v. Iron Mountain Mines, Inc.,* 881 F. Supp. 1432, 1449-52 (E.D. Ca. 1995) (U.S. not an operator though its activities during WWII included regulations encouraging zinc and copper mining, prohibition of gold mining, institution of price protections, labor regulations, and the threat of government seizure for failure to produce products government needed).

workings of, manag[ing], or conduct[ing] the affairs" of the PUD Facility. *See Bestfoods*, 524 U.S. at 66.

Conagra also asserts that the Government engaged in "affirmative misconduct," by which Conagra appears to be referring to "demands" the Government allegedly made regarding an agreement between New Lawrence and PUD. The Court infers that the agreement between New Lawrence and PUD related to disposal of PUD's waste on New Lawrence's property, and thus, that the Government's "demands" in relation to this agreement also related to disposal of PUD's waste on New Lawrence's property. But there is no plausible factual basis within the counterclaims from which the Court might infer that the Government's demands in this case extended outside of those normally made in the regulatory context. After all, it is the role of every regulatory authority to make demands of those who come before it looking for permits or financing. The Court is left to speculate that the unspecified demands of the Government are, in this case, somehow eccentric or inappropriate.

Because the Government is not alleged to have actually directed any of the operations at the PUD Facility in the manner contemplated by *Bestfoods* or other cases cited by Conagra, the counterclaims fail to state a claim for operator liability that is plausible on its face. *Iqbal,* 556 U.S. at 678; *Twombly,* 550 U.S. at 570.

### B. Arranger Liability

The First Circuit recently observed that "[w]ithin the CERCLA scheme, arranger liability was intended to deter and, if necessary, to sanction parties

11

seeking to evade liability by 'contracting away' responsibility." *Gen. Elec.*, 670 F.3d at 382 (citing *Team Enters., LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901, 907 (9th Cir. 2011)). Thus, in the *General Electric* case, the First Circuit found that a questionable "sale" of a polluting scrap material to a paint manufacturer who thereafter left the material on his property, causing environmental damage, made G.E. potentially liable for costs of cleaning up that property. *General Elec.*, 670 F.3d at 390.

Conagra cites *United States v. Washington State Dept. of Transp.*, 665 F. Supp. 2d 1233, 1241-42 (W.D. Wa. 2009) in support of its claim that the Government has arranger liability. In this case, the defendant's counterclaim for contribution based on arranger liability withstood a motion to dismiss where the United States Army Corps of Engineers was alleged to have conducted dredging that agitated toxic sediment in the bay.

Conagra also cites *United States v. Ottati & Goss*, 694 F. Supp. 977 (D.N.H. 1988), for in-Circuit authority for finding "the EPA liable where its cleanup efforts resulted in further hazardous waste being dumped on site . . . ." Def's Opp. to Mot. to Dismiss 9 (ECF No. 121). But Conagra neglected to cite the First Circuit opinion noting that there was no contribution claim in *Ottati & Goss,* and that "the court's 'liability finding' has no practical effect in respect to the judgment of the district court that is here before us under review. . . . Given the lack of practical effect, and hence our uncertainty about the meaning of this finding, any appeal is premature." *United States v. Ottati & Goss,* 900 F.2d 429, 442-43 (1st Cir. 1990). Given the

appellate court's decision, *Ottati & Goss* is simply not authority for the proposition claimed.

In any event, neither of these cases is applicable because the counterclaims do not allege that the Government is liable for further contaminating the Lagoons Site in any earth-moving action it undertook. The counterclaims also do not allege that the Government was responsible for producing the PUD Facility's waste. Thus, the counterclaim fails to state a claim for arranger liability.

**CONCLUSION**

The counterclaims for contribution and declaratory judgment rest on the Government's alleged liability for either operator or arranger liability under CERCLA. Because the counterclaims fail to state claims under either of these theories, the Court **GRANTS** the Government's motion. The counterclaims are **DISMISSED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 12th day of March, 2014.