## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil no. 2:11-cv-455-NT |
| | ) | |
| CONAGRA GROCERY PRODUCTS | ) | |
| COMPANY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON THE PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS; ON THE PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY; AND ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before the Court are three motions by Plaintiff United States of America (the "**Government**"): (1) its motion under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings (ECF No. 78), seeking to dismiss certain of Defendant ConAgra Grocery Products Co., LLC's ("**ConAgra**") affirmative defenses; (2) its motion in limine to exclude expert testimony of defense experts Douglas E. Simmons, P.G., and Craig MacPhee, P.E. (ECF No. 118); and (3) its Rule 56 motion for partial summary judgment on ConAgra's liability (ECF No. 116) under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 ("**CERCLA**"). Also before the Court is ConAgra's cross-motion for summary judgment (ECF No. 122). For the reasons that follow, the Government's motion for judgment on the pleadings and motion to exclude expert testimony are **DENIED**; the Government's motion for partial summary judgment is

**GRANTED in part and DENIED in part**; and ConAgra's cross-motion for summary judgment is **DENIED**.

## FACTUAL BACKGROUND[1]

This story of corporate successorship and of the handling of waste at a tannery in South Paris, Maine begins with the A.C. Lawrence Leather Company ("**Old Lawrence**"). Old Lawrence was a leather manufacturer that, as of 1952, owned several tanneries in the United States. PSMF ¶ 37. In December of 1952, Old Lawrence merged into Swift & Company, ("**Swift**"), and became a division of Swift. PSMF ¶¶ 2, 38. Swift dealt in numerous industries and products, including insurance and financial services, energy, chemical, and food products. PSMF ¶ 43. In 1953, Swift purchased certain parcels of land in South Paris, Maine, including a parcel which housed a leather tannery, and a parcel across the Little Androscoggin River that contained settling lagoons. PSMF ¶ 1. The settling lagoons were located on a seven-acre parcel of land, identified by the Government as Lot 7 on Paris, Maine tax map R2[2] (the "**Lagoons Site**"). *See* PSMF ¶¶ 1, 33. The tannery parcel and the settling lagoons were used by other tannery operations for some time prior to Swift's purchase. *See* DSMF ¶ 5. Old Lawrence built a new facility and, in November of 1955, it held a ribbon-cutting ceremony and began operations at the

[1]    The Government and ConAgra have each set forth statements of material fact in support of their cross-motions for summary judgment (each starting at paragraph 1), to which the other side has responded. Appendix A to this order sets forth all statements of fact used in this order as well as the opposing party's response and, where statements are qualified or denied, the Court's determination regarding use of the statement. Throughout this opinion, the Court refers solely to the statement of fact—for the Government, "**PSMF,**" and for Conagra, "**DSMF**"—intending thereby to incorporate the statement itself, the opposing party's response, replies, and determination by the Court, all as set forth in Appendix A.
[2]    *See* Appendix B (area map).

South Paris tannery. PSMF ¶ 2, *see also A Short History of the A.C. Lawrence Leather Co., Inc.*, 34-35 (E.J. Schneider, R.F. Goodspeed, and L.K. Barber, eds. 1982) (ECF No. 116-7).

The South Paris tannery used a chrome process for tanning hides into leather. PSMF ¶ 8. This process used chromium as well as a number of other chemicals which were mixed with water to tan hides into leather products. PSMF ¶¶ 10-16. The tanning process remained pretty much the same throughout the tannery's operations. PSMF ¶ 7. The tannery disposed of its waste by means of a flume to the Lagoons Site. PSMF ¶¶ 24-25. The waste, which was a watery mixture of processing chemicals and matter from the hides themselves, PSMF ¶¶ 14-18, flowed into the unlined settling lagoons and there it "dewatered"—i.e. solids settled and the water evaporated. PSMF ¶ 25.[3] Disposal in this manner created a strong odor that bothered town residents, PSMF ¶ 27, and the tannery commissioned several studies to examine how to minimize the problems associated with its waste. PSMF ¶ 28. Periodically, Old Lawrence dredged dewatered sludge from the lagoons to make room for more watered sludge. DSMF ¶ 20.

In addition to its sludge lagoons, Old Lawrence owned a parcel of approximately 48 acres down river from the tannery, Lot 24 on Paris, Maine tax map R2, which it used as a landfill (the "**Landfill Site**"). ConAgra wishes the Court to consider several properties in the vicinity of the tannery as one undifferentiated "site," *see* Counterclaim (ECF No. 112), ¶¶ 10, 13, 24-26, and 35. ConAgra also

claims that the Paris Utilities District ("**PUD**") used the Lagoons Site (Lot 7), as a landfill for dewatered sludge. DSMF ¶¶ 10 and 14; *see also* Conagra's Response to PSMF ¶¶ 32 and 33.[4] But contrary to ConAgra's contention, none of the record references support an inference that Lot 7 was used for anything other than receiving the wet waste from the tannery.

In 1973, Swift transferred Old Lawrence, including the South Paris tannery and Lagoons Site, to Estech, Inc. ("**Estech**"). PSMF ¶ 3. This transfer was part of a plan of merger and reorganization in which: 1) Swift transferred its non-food lines of business to a trio of companies dealing in energy, chemical, and financial services; 2) the energy, chemical, and financial services companies transferred all of

---

[3]      Neither party specifically describes the dewatering process, but it is described in an EPA interview memo (ECF No. 122-38) and in a June 4, 1992 Site Inspection Report by TRC Companies, Inc. 6 (ECF No. 116-40).

[4]      The Government asserts that the "landfill" or "Landfill Site" is "Parcel 24" or "Lot 24" on the tax map. Government's Mot. for Summ. J. 19, n. 10 (ECF No. 116) and Government's Reply in Support of Summ. J. 11 (ECF No. 126). The record is not entirely clear on this point. There are references to Lots 24 and 14 being lots where waste originating with the tannery was dumped. Most sources indicate that the landfill associated with the tannery and later, PUD, was Lot 24. *See* EPA Environmental Impact Statement at 28 (ECF No. 116-35) (appearing to describe Lot 24 as the site on which PUD initially proposed to dump its waste) and June 4, 1992 Site Inspection Report, TRC Companies, Inc. 6 (ECF No. 116-40) (appearing to describe Lot 24 as the site on which PUD dumped waste via permit extensions while looking for an alternative site); *see also* the April 26, 1993 Consent Decree and Order 2 (ECF No. 122-12) (identifying Lot 24 as the property upon which PUD had obtained the right to deposit sludge "pursuant to a written agreement with Lawrence's predecessor").

But two iterations of PUD's memorandum of understanding ("**MOA**") with Estech identify Lot 14 as the site for PUD's sludge disposal. *See* July 3, 1973 MOA between Estech and PUD ¶ 8 (ECF No. 116-36), and March 5, 1976 MOA between Estech and PUD ¶ 21 (ECF No. 123-11). Also, a "History of Site" of unidentified origin (ECF No. 122-36), which may be referring to these MOAs, refers to the deposit of sludge by PUD "on a 24 acre parcel (Map R-2, #14)." This reference to "Lot 14" may be a typo because the MOAs also describe this parcel as "premises west of the Canadian National Railway"—but lot 14 as shown on the tax map is east of the railway, whereas lot 24 is west of the railway. ConAgra also cites a March 26, 2007 phone conversation record (ECF No. 123-18) (indicating landfills "are on Lots 11 and 24"), but the Government objects to the introduction of this record as hearsay. The Court sustains the objection and therefore does not consider this record.

Ultimately, it does not matter whether the Landfill Site was Lot 24 or Lot 14, or even Lot 11. None of the records indicate that the Landfill Site was Lot 7. The Court therefore distinguishes the Landfill Site as a site separate and distinct from the Lagoons Site.

their stock to Swift; and 3) Swift transferred all of the energy, chemical and financial companies' stock to a holding company, Esmark Inc. ("**Esmark**"). *See* PSMF ¶¶ 44-47 and sources cited therein. Estech, as Esmark's chemical subsidiary, owned Old Lawrence's leather manufacturing business. *See* PSMF ¶¶ 44-47 and sources cited therein.

In the early 1970's, the town, Swift, and later Estech and other local businesses constructed a wastewater treatment plant, with assistance from state and federal funds, to treat municipal waste as well as tannery waste in a single facility. PSMF ¶ 29. The wastewater treatment plant (the "**PUD Facility**") opened in the summer of 1975. PSMF ¶ 30.

On March 5, 1976, Estech sold the tannery to a group of former tannery employees ("**New Lawrence**"). PSMF ¶ 4.[5] The parties disagree over the extent of the liabilities assumed by New Lawrence. *See* DSMF ¶¶ 108-111. The parties also disagree over when the tannery ceased using the settling lagoons. The Government claims that in September of 1975, the PUD Facility began accepting the tannery's waste for treatment and the tannery ceased using the Lagoons Site. PSMF ¶ 30. ConAgra asserts that New Lawrence continued to use the Lagoons Site up through 1977 or 1979. *See* DSMF ¶¶ 15-19; ConAgra's response to PSMF ¶¶ 30-32. At some point, the tannery did cease using the lagoons, and it ceased operations altogether in 1985. PSMF ¶ 6.

---

[5]     New Lawrence incorporated in Massachusetts in 1975 under the name New Lawrence, Inc., and changed its corporate name to A.C. Lawrence Leather Co., Inc. on March 2, 1976. *See* Government's Statement of Additional Material Facts ("**PASMF**") ¶ 4 and source cited therein. PSAMF ¶ 4 is also available in Appendix A.

In the meantime, the PUD Facility came under scrutiny from Maine's Department of Environmental Protection ("**MEDEP**") and from the EPA.[6] MEDEP disapproved of the Landfill Site (Lot 24), which PUD initially chose for disposal of its treated waste, though it allowed disposal on this site to continue for some time due to the lack of alternative disposal sites.[7] The PUD Facility also exceeded its federally-permitted discharge levels. *See* DSMF ¶¶ 29 and 53. In 1976, the EPA carried out an environmental impact statement on behalf of the Government regarding PUD's sludge disposal. DSMF ¶ 113.

Eventually, PUD and New Lawrence found themselves in court, arguing over whether New Lawrence owed PUD additional sums to share in the costs of its waste treatment and whether PUD must indemnify New Lawrence with regard to its dumping on New Lawrence's property. *See Paris Util. Dist. v. A.C. Lawrence Leather Co., Inc.*, 665 F. Supp. 944 (D. Me. 1987). Ultimately, the Landfill Site (Lot 24) became the subject of a consent decree between MEDEP and PUD, filed with the Maine Superior Court on April 26, 1993. DSMF ¶ 43. The consent decree required PUD, among other things, to secure the Landfill Site, deposit $250,000

---

[6]     *See* August 2, 1984 letter from EPA water management division director to PUD (ECF No. 122-44) (cited in support of DSMF ¶ 53) (noting that PUD had frequently violated the limits of its National Pollutant Discharge Elimination System permit, that the EPA and MEDEP inspected the PUD Facility, and that the EPA would issue an administrative order if MEDEP and PUD could not execute an administrative consent agreement).

[7]     *See* April 9, 1996 MEDEP Final Site Inspection 5 (ECF No. 116-41) (cited in support of PSMF ¶ 33) (noting that PUD was denied a permit by MEDEP for sludge disposal at what appears to be the Landfill Site (Lot 24), but that sludge disposal was allowed to continue at this site after 1975 via permit extensions granted by MEDEP and due to the lack of alternative disposal sites); April 26, 1993 Consent Decree and Order (ECF No. 122-12) (cited in support of DSMF ¶ 43) (reciting that MEDEP denied PUD permission to use Lot 24 for sludge disposal because of inadequate soil conditions but granted a series of conditional and temporary permissions to continue disposal on Lot 24 pending the outcome of litigation over an alternate sludge disposal site).

into escrow for environmental remediation of the site, and apply for a grant to complete remediation and closure of the site. *See* April 26, 1993 Consent Decree and Order 6-9 (ECF No. 122-12). The Landfill Site was not part of the 2006-2007 environmental remediation performed by the EPA for which the Government now seeks costs. *See* PSMF ¶ 34.

In 2000, the Town of South Paris received a complaint regarding "green ooze" on the bank of the Little Androscoggin River near the sludge lagoons. PSMF ¶ 70. The Government conducted a preliminary assessment in September of 2003. PSMF ¶ 72. The parties disagree regarding the level of contamination the Government found at the Lagoons Site and specifically whether the contamination was severe enough to warrant the environmental remediation performed by the Government. PSMF ¶¶ 71-72. In August of 2006, the Government commenced a removal action at the Lagoons Site, and it completed its work in September of 2007. PSMF ¶¶ 75-77. The Government entered into a series of agreements with ConAgra tolling the statute of limitations under CERCLA, the last of which expired on November 30, 2011. PSMF ¶¶ 78-80.

## PROCEDURAL BACKGROUND

On November 29, 2011, the Government filed a CERCLA complaint against ConAgra seeking recovery for $5.67 million in costs the Government incurred in its cleanup of hazardous waste at the Lagoons Site. The Government claims that ConAgra is the successor-in-interest to Swift and Estech.

ConAgra interposed a number of affirmative defenses to liability, including res judicata, issue preclusion, collateral estoppel, and the law of the case. Affirmative Defenses ¶¶ 21-24 (ECF No. 8). These preclusion defenses are based on ConAgra's claim that "various Courts, including this Court" had "judicially determined" that New Lawrence was solely responsible for contamination at the site. Affirmative Defenses ¶ 21. The Government's Rule 12(c) motion for judgment on the pleadings addresses these defenses, which also form part of ConAgra's motion for summary judgment.

The Government's motion for partial summary judgment aims to establish ConAgra's liability and deals with ConAgra's remaining liability defenses.[8]

---

[8]    On April 12, 2012, the Magistrate Judge (Rich, J.) granted the Government's motion to bifurcate the case into two stages: (I) liability and (II) damages. Order on Mot. to Bifurcate (ECF No. 23). ConAgra's affirmative defense paragraphs 2-5, 8, and 18, state defenses against damages, and the Government does not seek to address these defenses during the liability stage of the litigation.

On July 31, 2012, the Magistrate Judge granted the Government's motion to strike ConAgra's affirmative defense paragraphs 6, 7, 9, 12 through 15, 17, 19, 20, 25, 26, and 28. (ECF No. 35). The following chart summarizes the status of ConAgra's affirmative defenses:

| No. | Disposition | No. | Disposition |
|-----|-------------|-----|-------------|
| AD 1 | Incorporates ConAgra's answers to the Government's allegations | AD 15 | Stricken (ECF No. 35). |
| AD 2 | Damages defense; phase II. | AD 16 | *See* AD 10 |
| AD 3 | Damages defense; phase II. | AD 17 | Stricken (ECF No. 35). |
| AD 4 | Damages defense; phase II. | AD 18 | Damages defense; phase II. |
| AD 5 | Damages defense; phase II. | AD 19 | Stricken (ECF No. 35). |
| AD 6 | Stricken (ECF No. 35). | AD 20 | Stricken (ECF No. 35). |
| AD 7 | Stricken (ECF No. 35). | AD 21 | Subject of Government's 12(c) motion and ConAgra's cross-motion for summary judgment |
| AD 8 | Damages defense; phase II. | AD 22 | *See* AD 21. |
| AD 9 | Stricken (ECF No. 35). | AD 23 | *See* AD 21. |
| AD 10 | Subject of Government's motion for summary judgment | AD 24 | *See* AD 21. |
| AD 11 | *See* AD 10 | AD 25 | Stricken (ECF No. 35). |
| AD 12 | Stricken (ECF No. 35). | AD 26 | Stricken (ECF No. 35). |
| AD 13 | Stricken (ECF No. 35). | AD 27 | *See* AD 10 |
| AD 14 | Stricken (ECF No. 35). | AD 28 | Stricken (ECF No. 35). |

Affirmative Defenses ¶¶ 10, 11, 16 & 27. These defenses assert that ConAgra is not a successor-in-interest to any owner or operator of the site at the time of disposal of hazardous substances (this was pled both as a denial of allegations and as an affirmative defense), that the Government's claims are barred by the statute of limitations, and that CERCLA's statutory defenses are applicable to ConAgra.

Ancillary to its motion for summary judgment on liability, the Government filed a motion in limine to exclude ConAgra's experts' opinion that none of the soils removed by the Government were related to Old Lawrence's operations. The Court first addresses the Government's motion for judgment on the pleadings, then the Government's motion in limine, and finally, the parties' cross-motions for summary judgment.

## DISCUSSION

### I. The Government's Motion for Judgment on the Pleadings

The Government moves for judgment on the pleadings regarding ConAgra's affirmative defenses of res judicata, issue preclusion, the law of the case, and collateral estoppel, (Affirmative Defenses ¶¶ 21-24). These defenses are based on ConAgra's assertion that New Lawrence assumed all of the obligations and liabilities of the A.C. Lawrence Leather Company when it purchased this company from Estech in 1976, and that courts have already judicially determined that New Lawrence, and not ConAgra, was the party responsible for the disposal of hazardous substances at the site. Affirmative Defenses ¶ 21.

#### A. Legal Standard

"A motion for judgment on the pleadings is treated like a Rule 12(b)(6) motion to dismiss . . . ." *Portugues-Santana v. Rekomdiv Int'l Inc.*, 725 F.3d 17, 25 (1st Cir. 2013) (citing *Pérez–Acevedo v. Rivero–Cubano,* 520 F.3d 26, 29 (1st Cir. 2008); *Elena v. Municipality of San Juan,* 677 F.3d 1, 5 (1st Cir. 2012)). The standard on a 12(b)(6) motion to dismiss a claim is by now well-settled: the pleading "'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face,"'" *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 638-39 (1st Cir. 2013) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, (2007))). In this case the Government's motion is directed, not at the sufficiency of any claims, but at the sufficiency of ConAgra's affirmative defenses.

### B. Application of Rule 12(c) to Affirmative Defenses

Federal courts across the country have been grappling with the question of whether *Iqbal* and *Twombly's* plausibility requirements apply to a defendant's assertion of affirmative defenses.[9] *See, e.g.*, *Lane v. Page,* 272 F.R.D. 581, 588-597 (D.N.M. 2011); *Hansen v. Rhode Island's Only 24 Hour Truck & Auto Plaza, Inc.*, 287 F.R.D. 119, 122-23 (D. Mass. 2012). The First Circuit has not yet addressed this

---

[9]    ConAgra does provide some factual content as a basis for its preclusion defenses, identifying a consent decree in one case and a federal district court order in another case that allegedly preclude any re-litigation of the question of successor liability in this case. But the Government was not a named party to either of the prior cases cited in Defendant's answer, and ConAgra does not provide any other factual basis within its answer and affirmative defenses for the assertion—necessary for collateral estoppel—that the Government nevertheless had a fair opportunity to litigate the issues in the earlier cases. Further complicating the picture, ConAgra *does* allege within its counterclaims, which the Court has dismissed, that the Government was involved in negotiations that led to the consent decree. Neither side has suggested how the Court should treat these additional allegations in considering the Government's 12(c) motion.

question, and the parties have not argued this issue in their pleadings.[10] Because the parties have not brought the issue squarely before the Court, the Court takes no position on the necessity, generally speaking, for parties to plausibly plead facts supporting their affirmative defenses. But in this particular case it would serve no purpose to put ConAgra to the task of amending its answer to include factual allegations already stated within its motion for summary judgment.[11] Accordingly, the Court denies the Government's motion for judgment on the pleadings and, instead, reviews the merits of affirmative defense paragraphs 21-24 within the context of the parties' cross-motions for summary judgment.

## II. The Government's Motion in Limine to Exclude Expert Evidence

The Government has moved to exclude from Phase I of this litigation the first opinion in the expert report of Douglas E. Simmons, P.G. and Craig MacPhee, P.E., prepared for ConAgra (ECF No. 123-13) (the "**AECOM Report**"). The Court denies the Government's motion.

### A. Legal Standard

---

[10]     At the Court's request, ConAgra consolidated its response to the Government's motion for judgment on the pleadings with its own motion for summary judgment, which asserts in part that the Government's claims are barred by res judicata and collateral estoppel. This posture allowed ConAgra to assert a more fulsome explication of its preclusion defenses, and may have occluded the sufficiency-of-the-pleadings issue.

[11]     The Court expects that any order granting the Government's motion for judgment on the pleadings, which would be based on ConAgra's failure to plausibly support the elements of collateral estoppel within its statement of affirmative defenses, would provoke a motion by ConAgra to amend its answer and affirmative defenses, which the Court would grant. The parties have already moved beyond this point, having put together facts and arguments on summary judgment that embrace ConAgra's preclusion defenses.

Federal Rule of Evidence 702 assigns to this Court "'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Smith v. Jenkins*, 732 F.3d 51, 64 (1st Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

## B. Opinion 1 is Relevant to a Defense to Liability

As set forth in Section III below, there is more than one "liability" question at issue on these cross-motions for summary judgment, including whether ConAgra is liable under CERCLA as Old Lawrence's corporate successor and whether the Government's response costs were solely caused by entities other than Old Lawrence. As noted by the Magistrate Judge in an earlier decision (ECF No. 110), Simmons' and MacPhee's first opinion is, on its face, relevant to the latter liability question. Simmons' and MacPhee's first opinion states:

> 1. All the soils excavated by US EPA in the 2006-2007 removal action in the area of the former sludge disposal trenches (also referred to as "lagoons") appear not to be related to the Old A.C. Lawrence Tannery operations. Some of these soils appear to be related to the New A.C. Lawrence Tannery and/or tannery operations that occurred prior to 1955 when the Old AC Lawrence assumed control of the tannery.

AECOM Report 2 ("**Opinion 1**"). The parties agree that ConAgra cannot be liable to the Government if none of the contamination it removed was deposited between 1955 and March 5, 1976, which is what this opinion purports to say.

Opinion 1 is based on the EPA's reports that it removed 34,133.32 tons of chromium-contaminated soil from the lagoons, and Simmons' and MacPhee's calculations that this represented approximately 1.56 years' worth of tannery

sludge.[12] Simmons and MacPhee reasoned that, since at least one source indicated that Old Lawrence removed its sludge from the lagoons twice a year, and since at least one source indicated that New Lawrence continued to use the sludge lagoons until 1979, 100% of the removed, contaminated soil "may have been generated during New A.C. Lawrence's operation of the facility." AECOM Report 2-3.

In order for Opinion 1 to be relevant to liability, two predicate facts must be established: 1) that Old Lawrence was able to remove all of the sludge that it dumped into the lagoons, and 2) that New Lawrence used the sludge lagoons for at least 1.56 years past the March, 1976 sale. Both of these underlying issues are disputed by the parties and the record citations reveal competing facts.[13]

While there may be weaknesses in Opinion 1, those weaknesses are best exposed by "vigorous cross-examination" and "presentation of contrary evidence." *Daubert,* 509 U.S. at 596. Particularly where, as here, there will be no jury trial, the Court's gatekeeping role can be more relaxed. *See United States v. Brown,* 415 U.S. 1257, 1268 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

For these reasons, the Court denies the Government's motion in limine to exclude Opinion 1 of the AECOM Report.

### III.    The Parties' Cross-Motions for Summary Judgment

---

[12]    Simmons and MacPhee actually calculated that one year's worth of tannery sludge represented "approximately 64%" of the volume of the contaminated soils removed. This equates to a finding that the Government removed a total volume of sludge equivalent to 1.56 years' worth of tannery sludge. AECOM Rpt. 3.

[13]    *See* PSMF ¶¶ 30-31; DSMF ¶ 20.

The Government moves for partial summary judgment on the question of ConAgra's CERCLA liability. The parties agree that, to establish liability, the Government must show:

(1) a "release" or a "threatened release" of a "hazardous substance";

(2) from a "facility";

(3) by a person that is among the four classes of covered persons under Section 107(a) of CERCLA; and

(4) that the release or threatened release caused the Government to incur "response" costs.

*See* 42 U.S.C. § 9607(a); *United States v. Mottolo*, 695 F. Supp. 615, 622-23 (D.N.H. 1988), *aff'd*, 26 F.3d 266 (1st Cir. 1994). The four classes of covered persons are:

> the owner or operator of a contaminated vessel or facility; the owner and operator of a facility at the time it became contaminated; any person who arranges for the transport or disposal of hazardous wastes; and any person who accepts hazardous wastes for the purposes of transport or disposal.

*John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 404 (1st Cir. 1993) (citing 42 U.S.C. § 9607(a)). "Courts have interpreted this statute to include successor corporations . . . ." *Id.* (citations omitted.)

ConAgra does not dispute that, between 1955 and 1975, Old Lawrence released hazardous substances from a facility within the meaning of CERCLA. But it does dispute the Government's assertion that ConAgra is liable under CERCLA as Old Lawrence's corporate successor. On this point, ConAgra makes two arguments. First, it asserts that Old Lawrence's corporate successor has already

been judicially determined to be New Lawrence and the Government is estopped from now claiming that ConAgra is Old Lawrence's successor. This is the thrust of ConAgra's preclusion defenses. Second, ConAgra asserts that the Government has failed to establish the chain of corporate successorship from Old Lawrence to ConAgra.

The parties also disagree as to whether Old Lawrence's release of hazardous substances caused the Government to incur costs of environmental remediation. Here, ConAgra makes three arguments: (1) that the Government's actions were inconsistent with the National Contingency Plan ("**NCP**"),[14] (2) that the Government's response costs were solely caused by entities other than Old Lawrence, and (3) that even if some of the response costs were caused by Old Lawrence, the imposition of joint and several liability on ConAgra is improper because costs may be apportioned. Finally, ConAgra raises a statute of limitations defense.

### A. Legal Standard

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the Court "view[s] each motion separately and draw[s] all reasonable inferences in favor of the respective non-moving party." *Roman Catholic Bishop of Springfield v. City of*

---

[14]     The NCP, which CERCLA requires the Government to create, "provide[s] the organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants." 40 CFR § 300.1.

*Springfield*, 724 F.3d 78, 89 (1st Cir. 2013). On cross-motions, the Court must "decide 'whether either of the parties deserves judgment as a matter of law on facts that are not disputed.'" *Fid. Co-op. Bank v. Nova Cas. Co.*, 726 F.3d 31, 36 (1st Cir. 2013) (quoting *Barnes v. Fleet Nat'l Bank, N.A.,* 370 F.3d 164, 170 (1st Cir. 2004) (citation and internal quotation marks omitted)).

### B. Successor Liability Under CERCLA

Under CERCLA, liability under 42 U.S.C. § 9607(a) extends not only to the potentially responsible parties, but also to the corporate successors of those parties. *Boyd*, 992 F.2d at 404. The Court has clear guidance on several principles of corporate liability under CERCLA. *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998), explains that a corporate parent—i.e. a company that owns all of the stock of another corporation—is not subject to liability under CERCLA simply because its subsidiary owns or operates a polluting facility. But a corporate parent may accrue CERCLA liability to the extent it actually operates its subsidiary's polluting facility, *Bestfoods*, 524 U.S. at 66-68, or to the extent a traditional corporate veil-piercing analysis applies. *Id.* at 63.

The First Circuit has also made clear that a responsible party under 42 U.S.C. § 9607(a) that merges with another company brings its CERCLA liability into the merged successor entity. *Boyd*, 992 F.2d at 404. Finally, "[i]f § 9607(a) imposes liability on a party, then that party cannot escape liability by means of a contract with another party." *Id.* at 405 (citing 42 U.S.C. § 9607(e)(1)). While parties

can allocate responsibility among themselves by contract, "the government . . . can pursue any responsible party it desires." *Id.*

The parties agree that Old Lawrence operated the South Paris tannery between September of 1955 and March 5, 1976, when New Lawrence purchased it. Therefore, Old Lawrence is a potentially responsible party under 42 U.S.C. § 9607(a). The Government has established that Old Lawrence operated the tannery as a division of Swift between 1955 and 1973, PSMF ¶¶ 2 and 3, and Old Lawrence continued to operate the tannery as a division of Estech between 1973 and 1976. PSMF ¶ 38. The parties agree that Estech sold its leather manufacturing division, including the South Paris tannery, to New Lawrence on March 5, 1976, and that New Lawrence operated the tannery until its closure in 1985. The parties part ways from here, spawning two distinct issues. The first is whether, when Estech received Old Lawrence in 1973, it also took responsibility for all of Old Lawrence's pre-1973 environmental liabilities. The second is whether ConAgra is Estech's successor.

### 1. Whether Estech is Liable for Contamination Occurring from 1955-1973, When Old Lawrence was a Division of Swift

In order to determine whether it is appropriate to impose successor liability, courts apply state law "so long as it is not hostile to the federal interests animating CERCLA." *United States v. Davis*, 261 F.3d 1, 54 (1st Cir. 2001). The 1973 plan of merger and reorganization involving Swift and Estech was executed and filed in Delaware, making Delaware law applicable to the interpretation of its terms. Delaware follows the rule that "when one company sells or otherwise transfers all of its assets to another company, the buyer generally is not responsible for the seller's

liabilities" except where: (1) the buyer assumes liability; (2) the "sale" is a de facto merger or consolidation; (3) the "sale" is a mere continuation of the predecessor under a different name; or (4) the sale involves fraud. *Ross v. Desa Holdings Corp.*, C.A. No. 05C-05-013 MMJ, 2008 WL 4899226, *4 (Del. Sup. Ct., Sept. 30, 2008) (citing *Fehl v. S.W.C. Corp.*, 433 F. Supp. 939, 945 (D. Del. 1977); *Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 540 (D. Del. 1988)).

The Government makes two arguments in favor of its claim that Estech assumed Old Lawrence's pre-1973 environmental liabilities: (1) that the transfer of Old Lawrence to Estech from Swift was not an asset sale but, rather, a corporate reorganization in which Swift's liability was automatically transferred to Estech, and (2) that even if the transfer of Old Lawrence from Swift to Estech was merely an asset sale, Estech expressly assumed Old Lawrence's liabilities as part of the transfer. ConAgra, for its part, argues that the operative language in the 1973 merger and reorganization merely provides that Estech "<u>will</u> assume" liabilities associated with Old Lawrence's business, which "is a futuristic statement," and that "[i]t is unknown what liabilities, if any, were ultimately assumed or whether such liabilities were in fact transferred . . . ." Def's Reply in Support of Summ. J. 4 (ECF No. 131) (emphasis in original).

The Government fails to cite any authority for its argument that Esmark or Estech, as companies "formed" by Swift for purposes of its reorganization, automatically assumed Old Lawrence's environmental liabilities. Under Delaware law, the transfer of assets into a new company generally does not transfer

18

liability.[15] *See Ross*, 2008 WL 4899226 at *4. The only exception to this general rule identified by the Government is the express assumption of liability.

The available evidence regarding the terms of the transfer from Swift to Estech are those outlined in the 1973 agreement and plan of merger and reorganization. The plan provides in pertinent part:

> Each of [Esmark's new subsidiaries, including Estech] will assume the liabilities relating to the business or businesses acquired by it (through ownership of the stock where stock of subsidiary companies is acquired, and by the express assumption of such liabilities where assets other than stock are acquired) but will not assume any of Swift's long-term debt or any other liabilities of Swift which are not associated with such businesses . . . .

1973 Agreement and Plan of Merger and Reorganization, Art. 4.1 (ECF No. 116-15).

The Government claims that the language of this agreement constitutes an express assumption by Estech of Old Lawrence's CERCLA liabilities. Presumably, this is because Old Lawrence's CERCLA liabilities are "liabilities relating to the business." But CERCLA was enacted in 1980, seven years after Old Lawrence was transferred to Estech. Thus, at the time of the transfer, Old Lawrence's CERCLA liability was an unrealized, perhaps uncontemplated, contingent liability.

In *Boyd*, the First Circuit faced the question of whether parties to a pre-CERCLA asset sale transferred as-yet-unrealized CERCLA liabilities to the

---

[15]    After Swift's voluntary reorganization, which transferred a portion of Swift's assets to other entities, Swift remained an entity in possession of its food products line. For whatever reason, the Government has not undertaken to bring Swift or its successor in interest into court to assume the liability for pollution occurring between 1955 and 1973. *See* 42 U.S.C. § 9607(e)(1) ("No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section."); *Boyd*, 992 F.2d at 405.

transferee. *See Boyd*, 992 F.2d at 406-07. Interpreting Massachusetts law, *Boyd* held that:

> [t]o transfer CERCLA liability, the Agreement must contain language broad enough to allow us to say that the parties intended to transfer either contingent environmental liability, or all liability. The Agreement must recognize the possibility of future liability or dispense [the transferor] of all liabilities in the form of a general release.

*Id.* at 407. The parties have not analyzed *Boyd*, much less provided the Court with any Delaware law on point. Assuming that Delaware might decide the question of assumption of contingent liability similarly to Massachusetts, the record is insufficient to support a finding that Estech assumed Old Lawrence's as-yet-unrealized 1955-1973 CERCLA liability. Without further evidence, it is impossible to say that the parties intended for Estech to assume such liabilities.[16] *See id.* Accordingly, the issue of ConAgra's liability for pre-1973 pollution at the Lagoons Site cannot be determined on summary judgment.

Even if Estech is not liable for the pre-1973 pollution at the Lagoons Site, it is clearly a potentially responsible party based on its operation of Old Lawrence

---

[16]   The Government contends that a 2007 letter from ConAgra's counsel stands as evidence, or perhaps an admission, that Estech assumed Old Lawrence's CERCLA liability in the 1973 asset transfer. *See* Pl's Mot. for Summ. J. 17 (ECF No. 116), PSMF ¶ 48 and Ex. UU thereto, July 3, 2007 letter from Thomas C. McGowan Esq. to Rona Gregory, Esq. (ECF No. 116-49). The letter states, "[b]y express terms of the [1973] merger, this new Swift & Company held *only* food business assets and retained *no* assets or liabilities relating to former chemical/industrial business." Letter at 3 (emphases in original). In this letter, Mr. McGowan, who is ConAgra's counsel, was writing as counsel for Swift and Company. Setting aside any questions regarding conflict of interest, this statement is not an admission because it is not clear that Mr. McGowan was authorized to speak on ConAgra's behalf when making it. *See* Fed. R. Evid. 801(d)(2). It is also not evidence that Estech assumed Old Lawrence's pre-1973 CERCLA liability. There is no foundation to assume that Mr. McGowan has any personal knowledge of the intent of the parties at the time of the transfer. Assuming Mr. McGowan was speaking on behalf of Swift or its successor, this is more properly described as Swift's or its successor's position on the matter, and does not constitute evidence of what actually occurred.

from 1973 to 1976. This brings the Court to the question of whether ConAgra can be held liable under CERCLA as Estech's corporate successor.

## 2. Whether ConAgra is Estech's Successor

Estech had been Esmark's wholly-owned subsidiary since Swift's 1973 corporate reorganization. In 1976, Estech sold its A.C. Lawrence division in an asset sale to New Lawrence. But Estech could not divest itself of its CERCLA liability merely by selling Old Lawrence, nor could any contractual terms terminate Estech's liability. *See Boyd*, 992 F.2d at 405; 42 U.S.C. § 9607(e)(1). Once a potentially responsible party, Estech remained a potentially responsible party.

Estech continued its corporate existence after the 1976 sale. In August of 1984, Esmark was acquired by Beatrice Companies, Inc. PSMF ¶¶ 52-54. In 1986, Estech's stock was transferred to Beatrice Companies, Inc., and in 1987, Beatrice Companies, Inc. transferred Estech's stock to BCI Divestiture, Inc. ("**BCI**"). PSMF ¶¶ 55-56. As of August 14, 1990, BCI was owned by Beatrice U.S. Food Corp., which in turn was owned by Beatrice Company (not to be confused with the Beatrice Companies, Inc., above). PSMF ¶ 58. Up to this point, Estech kept its own corporate form, and the Government does not claim that, by acquiring Estech's stock, Beatrice Companies, Inc., BCI, Beatrice U.S. Food Corp., or Beatrice Company thereby acquired Estech's liabilities. *See Bestfoods*, 524 U.S. at 61-62.

In 1991, Estech merged into BCI, thereby transferring its liability to BCI. PSMF ¶ 62. *See Boyd*, 992 F.2d at 406, *see also* 8 Del. C. § 259 (in a merger, the surviving corporation assumes all liabilities of the constituent corporations). In a

series of mergers between 1991 and 1993, BCI then merged into Beatrice U.S. Food Corp., which merged into Beatrice Company, and Beatrice Company merged into Hunt-Wesson, Inc. PSMF ¶¶ 62-65. In 1999, Hunt-Wesson, Inc. changed its name to ConAgra Grocery Products Company, and in 2000 ConAgra Grocery Products Company merged into International Home Foods, Inc. and the two companies took the name "ConAgra Grocery Products Company." PSMF ¶¶ 66-68, DSMF ¶ 123. In 2005, ConAgra Grocery Products Company converted from a corporation to the limited liability company that is the Defendant in this case. PSMF ¶ 69. With these undisputed facts, the Government has demonstrated that CERCLA liability attaches to ConAgra as Estech's successor.

In a confusing and ultimately fruitless attempt to create the impression that the Government's chain of corporate succession contains broken links, ConAgra compares the allegations in the Government's complaint to the more precise, detailed description of corporate succession contained in the Government's statements of fact, and attempts to impeach the statements of fact through the slight variations between those statements and the allegations in the complaint. ConAgra's gambit fails in every instance.[17]

The Court pauses only to address ConAgra's argument that the Government must be held to the allegations in its complaint. *See, e.g., Noveletsky v. Metropolitan Life Ins. Co.*, No. 2:12-cv-21-NT, slip op. at 4 n. 2 (D. Me. Feb. 15, 2013) ("statement in an opposing party's pleading qualifies as an admission, rendering it admissible

---

[17] *See* PSMF ¶¶ 4, 6, 35, 38, 39, 40, 41, 42, 45, 46, 49, 50, 51, 53, 54, 57, 63, 66, 68, and 69.

for purposes of summary judgment"). ConAgra uses this principle in two different ways: (1) to assert that the Government cannot ultimately prove corporate succession because the allegations in the complaint fail to establish every link in the chain, and (2) to assert that the Government cannot contradict the allegations in its complaint with its statements of fact. The first proposition is flatly wrong. Rule 8 imposes notice pleading, and it was drafted specifically to do away with the old rules of technical pleading wherein a "failure to incorporate an essential allegation might lead to a speedy end of the litigation by way of demurrer or a motion to dismiss." Wright & Miller, *Federal Practice and Procedure: Civil 3d* § 1202.

While the second proposition is in some circumstances correct, ConAgra's attempt to weaponize every insignificant difference between the Government's complaint and its statements of fact does not comport with the purpose of the rules of civil procedure: "to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. While it is not fair to allow a plaintiff, without prior notice or amendment of their complaint, to contradict material parts of their stated claims in an effort to defeat summary judgment, nothing in the rules suggests that a party must be rigidly held to every detail of its pleadings at summary judgment. This is especially so where the allegations relate to ConAgra's corporate successorship. These facts are equally if not more available to ConAgra.[18]

---

[18] Conagra's cases are distinguishable. In *Stefanik v. Friendly Ice Cream Corp.*, 183 F.R.D. 52, 53-54 (D. Mass. 1998), the plaintiff first alleged that he was a Massachusetts resident, but later, in an attempt to defeat summary judgment, averred that he was a resident of Florida. In *Noveletsky,* the defendant asserted on summary judgment that the plaintiff had founded a steel erection

Whether the change is an illegitimate attempt to "kick over the chess board in the face of a checkmate," *Stefanik*, 183 F.R.D. at 54, is a judgment call that requires the Court to exercise common sense. In this case, the Government's complaint, which alleges that ConAgra is liable for Estech's polluting activities as a corporate successor, is entirely consistent with the facts and argument the Government has developed on summary judgment. ConAgra has no cause to complain of surprise or inability to access the source materials necessary to challenge the Government's asserted facts. ConAgra has failed to effectively dispute any of the links in the chain, and the undisputed facts establish ConAgra's status as Estech's successor for purposes of CERCLA liability.

### 3. ConAgra's Preclusion Defenses

ConAgra claims that when New Lawrence purchased the A.C. Lawrence Leather Company from Estech on March 5, 1976, it "assumed all liabilities and obligations of A.C. Lawrence Leather Company from Estech, Inc., excepting only labor, employment contracts, or pension and profit sharing plans, and in addition, the Parties signed an Assumption Agreement of even date." Answer ¶ 28.

Further, and specifically as the basis of its preclusion defenses, ConAgra asserts that "various Courts, including this Court" have "judicially determined" that New Lawrence, and not ConAgra, was the owner and operator of the tannery and the party responsible for the disposal of hazardous substances at the site. Affirmative Defenses ¶ 21. The cited orders include a consent decree entered in the

---

company. This fact was asserted in the complaint, and was a matter within the plaintiff's purview, making it the sort of allegation to which a plaintiff can reasonably be held on summary judgment.

Kennebec County, Maine Superior Court in *State of Maine v. A.C. Lawrence Leather Company, Inc.,* Doc. No. cv-88-373 (Me. Super. Ct. April 26, 1993) (reprinted at ECF No. 78-1), and an order in *Paris Utility District v. A.C. Lawrence Leather Co., Inc.*, 665 F. Supp. 944 (D. Me. 1987), *aff'd*, 861 F.2d 1 (1st Cir. 1988). Affirmative Defenses ¶ 21.

Although ConAgra's preclusion defenses are asserted under four titles, they boil down to one theory: issue preclusion, otherwise known as collateral estoppel, which is a form of res judicata.[19] *See* Def's Consolidated Opp'n to Summ. J. and Cross-Mot. for Summ. J. 8 (ECF No. 122) (citing *Miller v. Nichols*, 592 F. Supp. 2d 191, 196-97 (D. Me. 2009)); *see also Kurtz & Perry, P.A. v. Emerson*, 8 A.3d 677, 680-81 (Me. 2010) (collateral estoppel, also known as issue preclusion, is a component of res judicata). Maine law applies when determining the preclusive effect of the Superior Court consent decree, *see Miller,* 592 F. Supp. 2d at 196-97 (applying Maine law), and federal law applies when determining the preclusive effect of the federal court case, *see Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 89 (1st Cir. 2007).

### a. The 1993 Consent Decree

ConAgra asserts that certain language in the Consent Decree establishes that New Lawrence, not ConAgra, is Old Lawrence's successor and that this

---

[19] ConAgra appears to have abandoned its "law of the case" defense, which, although it "resembles res judicata . . . is more limited in its application [in that] it relates only to questions of law, and it operates only in subsequent proceedings in the same case." *Blance v. Alley*, 404 A.2d 587, 589 (Me. 1979). ConAgra does not claim that the case now before the Court is the same case as either *State of Maine v. A.C. Lawrence Leather Company, Inc.,* Doc. No. cv-88-373 (Me. Super. Ct.) or *Paris Utility District v. A.C. Lawrence Leather Co., Inc.*, Civ. Nos. 86-0111 P, 86-0234 P (D. Me.).

determination is binding on the Government in the present case. Within its preamble, the Consent Decree states:

> WHEREAS, from 1953 through 1985, Defendant A.C. Lawrence Leather Co., Inc. ("Lawrence") owned and operated a cattle hide tannery located in South Paris, Maine, and
>  . . .
>
> WHEREAS, from 1953 through 1975, Lawrence deposited wastewater and sludge containing chromium and other waste from its tannery on part of a parcel of land owned by Lawrence and described as Parcel 24 on Map R-2 of "Property Maps, Paris, Maine 1966, revised to April, 1992" more particularly described in Exhibit A, attached ("Lawrence site"), and
>  . . .
>
> WHEREAS, in 1975 the Defendant Paris Utility District ("District") . . . with the encouragement of the Department of Environmental Protection constructed a wastewater treatment facility, also known as a publicly owned treatment works or "POTW", for the purposes of treating sanitary sewerage generated in South Paris, Maine and, in addition, treating the industrial wastewater generated at Lawrence's tannery, and
>  . . .
>
> WHEREAS, pursuant to a written agreement with Lawrence's predecessor, the District secured the right to deposit sludge from the POTW on the Lawrence site . . .

April 26, 1993 Consent Decree and Order 1-2 (ECF No. 122-12). The Consent Decree then explains that, although MEDEP disapproved of PUD's dumping on the Landfill Site, it allowed PUD to continue dumping on the site because of a lack of alternatives, and PUD continued to use the site up through December 30, 1985, when the tannery closed. *Id.* at 2-4. It recites that Lawrence had entered into a proposed consent decree with regard to closure of the Landfill Site but failed to comply with it, and concludes that, with the Consent Decree, MEDEP and PUD

wished to move forward (apparently without Lawrence) to "remedy any potential environmental problems which are the subject of this litigation." *Id.* at 5. The Consent Decree then outlines actions PUD is required to take to secure and close the site. *Id.* at 6-9. Finally, the Consent Decree notes that nothing within the Decree may be construed as a release by PUD of claims it might have against Lawrence or any other entity potentially responsible for pollution at the Landfill Site. *Id.* at 9.

Under Maine law, collateral estoppel "'prevents the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding.'" *Portland Water Dist. v. Town of Standish*, 940 A.2d 1097, 1100 (Me. 2008) (quoting *Macomber v. MacQuinn-Tweedie,* 834 A.2d 131, 138–39 (Me. 2003)). Because collateral estoppel is concerned with factual issues, it applies even when the prior and present proceedings "offer different types of remedies." *Id.* But it arises "'only if the identical issue necessarily was determined by a prior final judgment.'" *Macomber*, 834 A.2d at 140 (quoting *Button v. Peoples Heritage Sav. Bank,* 666 A.2d 120, 122 (Me. 1995)). A party asserting collateral estoppel has the burden of demonstrating that the specific issue was actually decided in the earlier proceeding. *Macomber*, 834 A.2d at 140.

The question of successor liability under CERCLA was not raised, much less necessary to the resolution of any part of the Consent Decree. Rather, PUD, which was independently responsible for contamination at the Landfill Site, sought to

satisfy its own obligations through a consent decree with MEDEP. The purpose of the Consent Decree was to specify what actions PUD was required to take to discharge its responsibility to the State for its dumping onto the Landfill Site. A.C. Lawrence is mentioned only as part of the background description of how PUD became involved with dumping onto the Landfill Site, and also to explain why remediation of the site had been delayed. Tellingly, PUD reserved its rights as against A.C. Lawrence or any other parties that might be responsible for contamination at the Landfill Site.

Because the issue of CERCLA successor liability for Old Lawrence's disposal of hazardous substances was not at issue in the Consent Decree, it does not estop the Government[20] from asserting ConAgra's successor liability in this case.

### b. The 1987 Court Order

ConAgra similarly asserts that *Paris Utility District v. A.C. Lawrence Leather Company, Inc.*, 665 F. Supp. 944 (D. Me. 1987), determined that New Lawrence was Old Lawrence's successor and therefore also estops the Government from litigating this issue.

Under federal law, collateral estoppel "'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue

---

[20]    The Government also objects to the assertion that the Consent Decree is binding on it in any respect, pointing out that it was not a party to the litigation or in privity with any party thereto. *See Beal v. Allstate Ins. Co.*, 989 A.2d 733, 740 (Me. 2010) ("[A] party asserting nonmutual collateral estoppel . . . must establish that the party to be estopped was a party or in privity with a party in the prior proceeding. . . . Privity exists when two parties have a commonality of ownership, control, and interest in a proceeding." (internal citations omitted)). The Court need not resolve this issue because the preclusion argument fails on the first prong, i.e., whether the identical issue was determined in the earlier case.

cannot again be litigated between the same parties in any future lawsuit.'" *Ramallo*

*Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 89-90 (1st Cir. 2007) (quoting *Ashe*

*v. Swenson,* 397 U.S. 436, 443 (1970)). Federal courts have articulated a four-part

test:

> A party seeking to invoke the doctrine of collateral estoppel must
> establish that (1) the issue sought to be precluded in the later action is
> the same as that involved in the earlier action; (2) the issue was
> actually litigated; (3) the issue was determined by a valid and binding
> final judgment; and (4) the determination of the issue was essential to
> the judgment.

*Ramallo*, 490 F.3d at 90 (citing *Keystone Shipping Co. v. New England Power Co.,*

109 F.3d 46, 51 (1st Cir. 1997).

ConAgra's claim that Old Lawrence's successor was judicially determined in

this order rests on a reference to Estech as New Lawrence's "predecessor" within

the order's findings of fact. *See PUD v. A.C. Lawrence*, 665 F. Supp. at 946. ConAgra

argues that since the court found that Estech was New Lawrence's predecessor,

then New Lawrence (not ConAgra) must be Estech's successor. This argument fails.

The order addresses a contract dispute between PUD and New Lawrence. Nothing

in this order indicates that the Court was inquiring into the question of who

Estech's successor was for purposes of establishing CERCLA liability. In referring

to Estech as New Lawrence's predecessor, the Court was merely recounting the

generally acknowledged fact that Estech and PUD had entered into a contract

relating to the construction, funding, and operation of the PUD facility, and that

Estech's rights and obligations under the contract were assumed by New Lawrence

when New Lawrence became the tannery's owner. Accordingly, this order does not estop the Government from asserting ConAgra's successor liability.

### C. Whether Estech's Release of Hazardous Substances Caused the Government to Incur Response Costs

Under the final element for establishing CERCLA liability, the Government must demonstrate that a release or threatened release of hazardous substances caused the Government to incur response costs. 42 U.S.C. § 9607(a)(4). ConAgra makes three claims pertaining to this element. First, ConAgra argues that Old Lawrence removed the sludge it dumped onto the Lagoons Site and that none of the waste removed by the Government belonged to Old Lawrence. Second, ConAgra argues that the dumping at the Lagoons Site did not cause the Government to incur response costs because the Government's costs were incurred in a manner inconsistent with the National Contingency Plan ("**NCP**"). Third, ConAgra argues that, even if some of the Government's response costs were caused by a release or threatened release of hazardous substances at the Lagoons Site, costs may be apportioned, making the imposition of joint and several liability improper.

### 1. Whether the Government's Response Costs Were Caused Solely by Entities Other Than Old Lawrence

ConAgra claims that Old Lawrence cleaned out all of its own waste after dumping it onto the Lagoons Site, and thus it cannot be liable under CERCLA. ConAgra includes this argument in a section of its memorandum dealing with apportionment. Def's Consolidated Opp'n to Summ. J. and Cross-Mot. for Summ. J. 23. ConAgra also argues in a section of its memorandum dealing with affirmative

defenses that it should be granted summary judgment on liability because it has established under 42 USC 9607(b)(3) that the contamination was caused by "multiple third parties." Def's Consolidated Opp'n to Summ. J. and Cross-Mot. for Summ. J. 24.

ConAgra's claim that Old Lawrence removed all of its sludge from the Lagoons Site can be analyzed in several ways. First, it can be seen as a claim that the Government has failed to meet its burden of establishing an essential element of its claim, i.e, that the defendant's waste caused the Government to incur response costs. This is an uphill climb for Defendants since:

> To satisfy the causal element, it is usually enough to show that a defendant was a responsible party within the meaning of 9607(a); that clean up efforts were undertaken because of the presence of one or more hazardous substances identified in CERCLA; and that reasonable costs were expended during the operation.

*Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 77 (1st Cir. 1999). Second, ConAgra's claim can be seen as an affirmative defense under 42 USC § 9607(b)(3) that the damages were caused solely by the act or omission of a third party. Section 9607(b) provides that:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release . . . of a hazardous substance and the damages resulting therefrom were caused solely by . . . (3) an act or omission of a third party . . .

42 U.S.C. § 9607(b)(3). Finally, ConAgra's argument can be analyzed as an argument that the harm Old Lawrence caused was *de minimis* and therefore under equitable powers granted to the Court under 42 USC 9613(f), the Court should find

that ConAgra is not liable. *See Acushnet*, 191 F.3d at 77-78 ("[A] defendant may avoid joint and several liability" for CERCLA response costs "if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances" but that this "rule is not based on CERCLA's causation requirement, but is logically derived from § 9613(f)'s express authorization that a court take equity into account when fixing each defendant's fair share of response costs.").

Because the record contains disputed facts as to whether Old Lawrence removed all of its waste, summary judgment is inappropriate for either party under any of these analyses.

### 2. Whether Consistency with the NCP Must be Demonstrated to Establish Liability

Under 42 U.S.C. § 9607(a)(4)(A), the Government may recover "all costs of removal or remedial action . . . not inconsistent with the national contingency plan." ConAgra argues that the Government's efforts at the Lagoons Site, from its inept investigation of the possible contamination, to an erroneous determination that soil removal was necessary, to egregious cost-overruns, were entirely unnecessary and inconsistent with the NCP. *See* DSMF ¶¶ 57-97.[21] As a result, ConAgra claims that the Government's response costs cannot be said to be "caused" by a release or threatened release, because they were caused solely by the Government's own unnecessary actions. *See Acushnet*, 191 F.3d at 77 n. 7 ("It might, of course make sense to say that a defendant's release did not 'cause' the incurrence of response

costs when the monies were expended for purposes wholly unrelated to responding to environmental contamination.").

The Court need not reach this issue because ConAgra appears to concede that some of the steps taken by the Government (backfill of excavated site with uncontaminated soil, grading site, repairing river bank, PSMF ¶ 75), were appropriate. *See* DSMF ¶¶ 91-92 (capping the site, stabilizing the river bank, covering the exposed area etc., would have been appropriate.) Thus, ConAgra's argument that there can be no liability where the Government fails to incur *any* response costs consistent with the NCP is inapplicable to this case.

Even if a great deal of the Government's expenditures were wasteful, it does not defeat ConAgra's liability, but merely serves to diminish ConAgra's damages. *See, e.g., United States v. Atlas Minerals and Chem., Inc.*, 797 F. Supp. 411, 418-19 (E.D. Pa. 1992) (factors such as "the consistency of the government's actions with the NCP" cannot serve as a defense to liability but may be taken into account during apportionment of damages, even to the exclusion of damages entirely); *Mottolo*, 695 F. Supp. at 630 (analyzing the consistency of the government's response with the NCP as a question of damages, not liability). ConAgra will have an opportunity during the damages phase of the litigation to demonstrate which of the Government's actions were unnecessary or inconsistent with the NCP, and thereby to reduce its damages.

### 3. Whether Apportionment Must be Considered Before Determining Liability

---

[21] These statements of fact are not included within Appendix A because they are not relevant to the determination of ConAgra's liability. They may be found at ECF No. 122-1.

Apportionment refers to the common law concept, which has been adopted into CERCLA, that "where environmental harms are divisible, a defendant may be held responsible only for his proportional share of the response costs." *Acushnet,* 191 F.3d at 77, *see also Burlington N.*, 556 U.S. at 614 ("[A]pportionment is proper when 'there is a reasonable basis for determining the contribution of each cause to a single harm.'" (quoting *Restatement (Second) of Torts* § 433A(1)(b)). Apportionment is not a liability question. ConAgra is free to demonstrate during the damages phase of litigation that it is liable for only some divisible portion of the Government's reasonable costs of remediation.

## B. The Statute of Limitations

Finally, ConAgra claims that partial summary judgment in the Government's favor is improper because there is a question whether the Government has filed its claims against ConAgra within the statute of limitations. CERCLA requires the Government to commence its cost recovery action within three years after the completion of its removal action. 42 U.S.C. § 9613(g)(2). The Government has demonstrated that it completed its removal action in September of 2007, that beginning on August 25, 2010, it entered into a series of tolling agreements with ConAgra, and that the last of these tolling agreements expired on November 30, 2011. The present case was filed on November 29, 2011, one day prior to the expiration of the last tolling agreement between ConAgra and the Government.

ConAgra claims that these tolling agreements do not establish that the Lagoons Site was the subject of the agreements. This argument verges on bad faith.

The titles and content of these agreements in combination with their timing conclusively demonstrate that they relate to the Lagoons Site. Likewise, ConAgra's claim that the statute of limitations may have run long ago based on the conclusion of unidentified "[p]rior EPA-directed actions at the overall facility," Def's Consolidated Opp'n to Summ. J. and Cross-Mot. for Summ. J. 8 (ECF No. 122), finds no support in the record or the law. Contamination at the Lagoons Site was first discovered in 2000, and the Government undertook a year-long removal action at this site in 2006-2007.

## CONCLUSION

For the above-stated reasons, the Government's motion for judgment on the pleadings and its motion in limine to exclude expert testimony are **DENIED** but its motion for partial summary judgment is **GRANTED in part and DENIED in part**. ConAgra's affirmative defense paragraphs 10, 11, 16, and 21-24 are stricken. ConAgra's cross-motion for summary judgment is **DENIED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this    day of March, 2014.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil no. 2:11-cv-455-NT |
| | ) |
| CONAGRA GROCERY PRODUCTS | ) |
| COMPANY, LLC, | ) |
| | ) |
| Defendant. | ) |

## APPENDIX A[1]

| GOVERNMENT'S STATEMENTS OF FACT |
|---|
| **PSMF 1:** *In or around December 1953, Swift & Company purchased certain parcels of land in South Paris, Maine, including a parcel on which it constructed a leather tannery ("South Paris Tannery") and a parcel across the Little Androscoggin River that contained settling lagoons ("Lagoons Site") used to collect tannery waste.*<br><br>**Admitted** |
| **PSMF 2:** *In or around November 1955, the A.C. Lawrence Leather Company division of Swift & Company held a ribbon cutting ceremony at the South Paris Tannery, after which it began operating the South Paris Tannery and began disposing of tannery waste at the Lagoons Site.*<br><br>**Admitted** |
| **PSMF 3:** *In or around 1973, Swift & Company transferred its A.C. Lawrence Leather Company division, including the South Paris Tannery and the Lagoons Site parcel, to Estech, Inc.*<br><br>**CONAGRA'S RESPONSE**: **Qualified**. Grocery[2] admits Plaintiff's Exs. N and O. However, Grocery denies the balance of Plaintiff's factual statement as follows: |

---

[1]    The facts and responses contained in this appendix have been cut and pasted from the parties' pleadings and include all typos, grammatical and spelling errors as they originally occurred. Record citations for the facts themselves are not included.

[2]    While the Defendant refers to itself herein as "Grocery," the Court refers to the Defendant as ConAgra.

1

All assets may not have been acquired. Plaintiff's Ex. M refers to "All or substantially all of the assets." No bill of sale or similar transfer document has ever been provided showing what assets, if any, were acquired. All liabilities were not assumed. The quoted language above specifically discusses long term debt and "other liabilities of Swift which are not associated with such business". Further, the quoted language provides that "(Esmark's new subsidiaries) will assume the liabilities." The latter quote is a futuristic statement. It is unknown what liabilities, if any, were ultimately assumed or whether such liabilities were transferred "intact".

Defendant has no documentation whereby whatever subsidiary(ies) Plaintiff claims of Esmark, Inc. (pursuant to Plaintiff's Ex. M) would assume any such liabilities. There has been no documentation provided, or known to exist, whereby the liabilities of A.C. Lawrence Leather Company would have been assumed.

**COURT DETERMINATION. Qualification rejected, deemed admitted.**
ConAgra claims that the Government lacks documentation that Swift transferred all of Old Lawrence's assets to Estech in 1973, but the 1973 plan contemplates the transfer of all or substantially all of Old Lawrence's assets, and ConAgra's expert (Jeff Thaler) acknowledges that Old Lawrence "continued as a division of Estech, Inc." after the 1973 merger and reorganization. (ECF No. 122-79). ConAgra's additional claims regarding liabilities are non-responsive.

**PSMF 4:** *In or around March 5, 1976, Estech, Inc., sold a large portion of the business, real property and assets of the A.C. Lawrence Leather Company division to a group of the division's management and employees, who separately incorporated the company as A.C. Lawrence Leather Company, Inc. ("New Lawrence")*

**CONAGRA'S RESPONSE: Denied**. The March 5, 1976, Estech, Inc. sale was to A.C. Lawrence Leather Co., Inc., a Massachusetts corporation ("New Lawrence"). New Lawrence, pursuant to this Agreement (1976 Sale Agreement, Exhibit 1), purchased all of the assets of A.C. Lawrence Leather Company "Old Lawrence", including all real, personal, mix, tangible and intangible assets including the A.C. Lawrence Leather Company name and all other marks. In addition, New Lawrence assumed all liabilities of "Old Lawrence" excepting only liabilities associated with labor or employment contracts, or the pension or profit sharing plans.

**COURT DETERMINATION: Denial rejected, deemed admitted.** ConAgra appears to find the distinction between "A.C. Lawrence Leather Company, Inc." and "A.C. Lawrence Leather Co., Inc." material, but does not aver that these are two different companies. The Court finds "Co." indistinguishable from "Company" as its common abbreviation.

To the extent ConAgra is disputing that New Lawrence was composed of

management and employees of Old Lawrence, they admitted as much in their answer to ¶ 28 of the complaint (ECF No. 8).

ConAgra's additional claims regarding liabilities are non-responsive.

---

**PSMF 5**: *By the time of this sale, Swift & Company and Estech, Inc., had used the Lagoons Site for about 20 years for the disposal of waste from the South Paris Tannery, from approximately 1955 until 1975.*

**CONAGRA'S RESPONSE: Denied**. Swift & Company and Estech, Inc. never used the Lagoons Site. At all times, Old Lawrence personnel was running and in charge of the South Paris Tannery operations. (Abate Dep. at 68:9-15, Exhibit 2.) The supervisory personnel and employees that purchased Old Lawrence were the individuals that were running the day-to-day operations at the South Paris facility, not Estech, Inc. (Abate Dep. at 68:1-73:11, Exhibit 2.) The employees of Old A.C. Lawrence, not Estech, Inc. or Swift & Company were running the facility, including the determination of where to dispose of waste. (Abate Dep. at 69:3-15, Exhibit 2.) Further, "waste" is not defined by Plaintiff, and to the extent Plaintiff implies it to be hazardous waste, that portion is likewise denied.

**COURT DETERMINATION: Denial rejected, deemed admitted**. Old Lawrence dissolved in 1953 after Swift became its sole owner, and thereafter operated as a division of Swift until Swift conveyed this division to Estech in 1973. *See* PSMF ¶¶ 38, 46 and 47. Because Old Lawrence did not have a separate corporate existence from 1953-1976, it is fair to say that Swift and Estech operated Old Lawrence including the tannery and sludge lagoons.

---

**PSMF 6**: *New Lawrence continued to operate the South Paris Tannery until 1985, when the South Paris Tannery shut down.*

**CONAGRA'S RESPONSE: Qualified**. "New Lawrence" as defined by Plaintiff in ¶ 4 is incorrect. *See* response to ¶ 4 above.

**COURT DETERMINATION: Qualification rejected, deemed admitted.** ConAgra's qualification is immaterial per the Court's determination of ConAgra's response to PSMF ¶ 4.

**PSMF 7:** *From 1955 until 1976, the South Paris Tannery's production of leather was largely uninterrupted, and the process remained generally the same.*

**CONAGRA'S RESPONSE: Qualified**. The South Paris Tannery's production of leather was largely uninterrupted, and the process remained generally the same until 1985. (McIntyre Dep. at 118:22-119:15, Exhibit 3.)

**COURT DETERMINATION: Qualification rejected, deemed admitted.** The cited record material does not support ConAgra's claim that the process remained the same until 1985.

---

**PSMF 8**: *The South Paris Tannery processed raw cowhides into finished leather using a chrome tanning process.*

**Admitted**

---

**PSMF 10:** *The chrome tanning process was performed by exposing a raw hide to chromium or chromium salt, usually a basic chromium sulfate.*

**Admitted**

---

**PSMF 11:** *The South Paris Tannery ordered chemicals, including chromium, for use in the tanning process.*

**Admitted**

---

**PSMF 12:** *Prior to use, the chromium was stored at the South Paris Tannery in a large tank.*

**Admitted**

---

**PSMF 13:** *The South Paris Tannery received shipments of raw hides from hide suppliers.*

**Admitted**

---

**PSMF 14:** *Each hide was trimmed, soaked, fleshed, placed in lime pits, and run through a dehairing machine.*

**Admitted**

---

**PSMF 15:** *A batch of hides was then placed into one of multiple tanning wheels, into which chromium and other chemicals were added.*

| |
|---|
| **Admitted** |

| |
|---|
| **PSMF 16:** *Once the tanning process was complete, the tanning waste was allowed to drain from the tanning wheel onto the floor.*<br><br>**Admitted** |

| |
|---|
| **PSMF 17:** *The tanning waste from each tanning wheel contained approximately 74 lbs of chromium.*<br><br>**CONAGRA'S RESPONSE: Denied**. This broad statement is not supported by the record citation. Plaintiff's Ex. J, a Pilot Study prepared for Plaintiff's use, is dated September 1969. Thus Grocery admits this statement only for the very limited time referenced in the Pilot Study.<br><br>**COURT DETERMINATION: Denial rejected, deemed admitted**. ConAgra admits PSMF ¶ 7, which states that the process remained generally the same throughout the tannery's operation. The estimated amount of chromium is accepted. |

| |
|---|
| **PSMF 18:** *Each hide was then placed on one of multiple wringer machines, which would squeeze remaining tanning waste and other liquids out of the hide and onto the floor.*<br><br>**Admitted** |

| |
|---|
| **PSMF 24:** *The tanning waste flowed through the trough or flume over a bridge, to the opposite bank of the Little Androscoggin River.*<br><br>**Admitted** |

| |
|---|
| **PSMF 25:** *The tanning waste then flowed into a series of unlined pits or lagoons.*<br><br>**Admitted** |

**PSMF 27:** *Disposal in this manner created a noxious odor that bothered town residents.*

**CONAGRA RESPONSE**: **Denied and objection**. The referenced record citations lack foundation, and in any event, only support a strong odor, not that such odors were "noxious" i.e. harmful.

**COURT DETERMINATION**: **Qualification accepted, fact modified; objection overruled**. There is no objection to foundation in the depositions themselves, nor any cite to an agreement by the parties that all objections are preserved without the need for objection.

---

**PSMF 28:** *The South Paris Tannery commissioned several studies to examine how to minimize the problems associated with its waste.*

**Admitted**

---

**PSMF 29:** *The town, Swift & Company, and later Estech, Inc., and other local businesses constructed a wastewater treatment plant, with partial assistance from state and federal funds, which was designed to treat chrome tannery wastes, food processing wastes, domestic wastes, and storm water within a single facility.*

**CONAGRA'S RESPONSE**: **Denied**. Per Plaintiff's Ex. FF, the Trustees of the Paris Utility District constructed the Pollution Control Facility. "The project was funded by grants of $3,540,000.00 from the U.S. Environmental Protection Agency, $470,000.00 from the State of Maine Department of Environmental Protection, $1,758,000.00 from the A.C. Lawrence Leather Co., $50,000.00 from the A.L. Stewart & Sons Co., and the remaining $1,000,000.00 from the Paris Utility District." There is no record support for the assertion that Estech, Inc. was involved with the construction of the wastewater treatment plant.

**COURT DETERMINATION**: **Denial rejected, deemed admitted**. ConAgra falsely asserts that there is no record support for Estech's involvement in the construction of the PUD facility. Pl's Ex. HH (ECF 115-37) is a July, 1973 memorandum of agreement between Estech and the PUD that "set[s] forth the basic rights and responsibilities of the [PUD] and [Estech] with respect to the financing, construction, operation and maintenance of a *joint treatment facility . . .*" (emphasis added).

---

**PSMF 30:** *The wastewater treatment plant, called Paris Utility District (PUD), opened in the summer of 1975, and began accepting waste from the South Paris Tannery in September 2, 1975.*

**CONAGRA'S RESPONSE**: **Denied**. The waste lagoons continued to be used until

the tannery closed (1985). (Everett Dep. at 36:9-14, Exhibit 4.)

The following documents, as contained in EPA's Administrative Record for the Site:

1. USEPA Region 1 Pollution Reports for the Site: August 9, 2006; September 7, 2006; September 19, 2006; October 12, 2006; November 29, 2006; and March 9, 2007. Wherein each states:

> From approximately 1952 to 1977, the A.C. Lawrence tannery (tannery) facility formerly located on the west bank of the Little Androscoggin River, used a metal trough to transport their waste to settling lagoons on the southeast bank of the Little Androscoggin River.

> In the 1970s, the South Paris Publicly Owned Treatment Works was constructed and began accepting waste from the tannery. In 1977, the lagoons ceased receiving waste and a soil cap was placed over the sludge lagoons. The tannery closed in 1985.

(USEPA Pollution Reports, Exhibit 5.)

2. EPA's July 26, 2006 Request for Removal Action at the A.C. Lawrence Site. Wherein:

> From approximately 1952 to 1977, the A.C. Lawrence tannery (tannery) facility formerly located on the west bank of the Little Androscoggin River, used a metal trough to transport their waste to settling lagoons on the southeast bank of the Little Androscoggin River.

> In the 1970s, the South Paris Publicly Owned Treatment Works was constructed and began accepting waste from the tannery. In 1977, the lagoons ceased receiving waste and a soil cap was placed over the sludge lagoons. The tannery closed in 1985.

(Request for Removal Action, Exhibit 6.)

3. "New Lawrence continued to contribute industrial waste to the lagoon site until June of 1979." (Hennessy Dep. at 75:12-76:9, Exhibit 7.)

4. USEPA Region 1 letter of June 7, 1979 from Lawrence F. Sheehan. (Sheehan Letter June 7, 1979, Exhibit 8.)

5. USEPA letter of December 28, 1976 by Lawrence F. Sheehan, Jr., Chief Engineering Section of the U.S. EPA Lawrence F. Brown, Chairman, Board of Trustees wherein Mr. Sheehan indicates that the Memorandum of Agreement

executed on March 5, 1976 by and between the Paris Utility District and Estech, Inc. is "in accordance with the regulations applicable to the above referenced grant offer." (Sheehan Letter Dec. 18, 1976, Exhibit 9.)

6. Memorandum of Agreement dated March 5, 1976 by and between Paris Utility District and Estech, Inc. That Agreement, states inter alia that the District has determined that it will be for the public good and welfare to construct a treatment system; that the Paris Utility District wishes to finance, construct, operate and maintain the system for the collection and treatment of sewage; the Agreement estimates the cost of construction to be $6,695,000.00; and the Agreement contemplates potential financing for the Agreement. (1976 MOA, Exhibit 9.)

7. Even after 1979 when portions of the waste (i.e. were transported to the waste water treatment plant the solids from the tannery were mechanically removed prior to the remainder of the waste being sent to the Paris Utility District. These waste solids (sludge) continued to be disposed of at the lagoon site. (Plaintiff's Ex. WW).

8. In 1977 the lagoons ceased receiving waste and a soil cap was placed over the sludge lagoons. (Arthur Johnson, EPA 30(b)(6) "Disposal" Dep. at 23:22-24:10, Exhibit 10.)

9. Expert Report of Douglas Simmons and Craig MacPhee (AECOM Expert Report, Exhibit 11.)

10. The three maps with the legend stating ponds continued in operation through at least 1976. (USEPA Figure 3: Exhibit 12.)

11. EPA admits that there are at least three sources of sludge that went into the lagoons, including operations after March of 1976. (McIntyre Dep. at 171:19-173:10, Exhibit 3.)

12. The waste was still being disposed of in the lagoons at the Site in 1976. (MacPhee Dep. at 8:3-9, Exhibit 13.)

13. The Site was used through 1977 and in certain instances until 1979. (Simmons Dep. at 48:16-18, Exhibit 14.)

14. NUS Report on May 25, 1979, A.C. Lawrence transfers operations of disposal to the Paris Utility District. (NUS Report, Exhibit 15; Simmons Dep. at 55:21-22, Exhibit 14.)

15. The trenches continued to be used until 1979. (Simmons Dep. at 55:6-8., Exhibit 14.)

**COURT DETERMINATION**: **Denial partially accepted and partially rejected; deemed partially admitted and partially disputed.**

ConAgra's sources create a material issue of fact regarding whether the sludge lagoons continued to be used through 1977 or through May 25, 1979, but do not support its contention that the sludge lagoons continued in use through 1985. The record "evidence" ConAgra cites in support of its claim that the sludge lagoons continued to be used after September 1975 falls into three categories:

(1) **Testimony and documents that do not support ConAgra's position**.

This is the category into which most of ConAgra's record citations fall, including:

- The Everett Deposition (ECF No. 123-6): The deposition excerpts presented reveal that Everett was guessing when the sludge lagoons ceased being used rather than offering a fact based on personal knowledge.
- The Hennessy Deposition (ECF No. 123-9): ConAgra materially misquotes the deposition by inserting the word "lagoons"; also, in the cited portion of this deposition, Hennessy is asked to read a portion of a document, and is not actually testifying to anything.
- The June 7, 1979 Sheehan letter (ECF No. 123-10): ConAgra fails to explain how this letter supports its claim that the lagoons continued to be used through 1985. This letter concerns merely the approval for PUD's construction of additional temporary sludge storage facilities.
- The December 28, 1976 Sheehan letter (ECF No. 123-11): This letter likewise does not speak to use of the sludge lagoons.
- The Simmons/MacPhee Expert Report (ECF No. 123-13): The expert report does not contain any independent facts regarding continued use of the sludge lagoons, but merely repeats information contained in EPA documents.
- Esmark's 1973 10-K report (ECF No. 116-51): This document says nothing about the sludge lagoons, and predates the relevant time period regarding use of the sludge lagoons (from September of 1975 through 1985).
- The Johnson Deposition (ECF No. 123-12): In the cited portion of the deposition, Johnson is asked to read a portion of a document. He does not testify that "In 1977, the lagoons ceased receiving waste and a soil cap was placed over the sludge lagoons."
- Aerial photos of the sludge lagoons (ECF No. 123-14): These photos do not speak to the question whether the sludge lagoons continued in use after September of 1975.
- The Simmons Deposition (ECF No. 123-16): Douglas Simmons is one of ConAgra's experts, but the fact attributed to him, "The Site was used through 1977 and in certain instances until 1979" is not an opinion. It is not based on his inspection of the site, data analysis, or other use of scientific, technical or specialized knowledge, but is merely a repetition of information contained in

EPA documents.

## (2) <u>Noncontemporaneous Reports from the EPA or its Agents:</u>

- The EPA reports, which include a 2006 EPA request for removal action (ECF No. 123-8) and several EPA pollution reports from 2006-2007 (ECF No. 123-7), state, in their site descriptions, that the lagoons ceased receiving waste and a soil cap was placed over the lagoons in 1977.

The Government points out that these statements were not based on first-hand knowledge or a historical, contemporaneous source of information. The Government's historical, contemporaneous sources of information, including the September 3, 1975 Finnegan Letter (ECF No. 115-39), the December 10, 1975 Hickman Letter (ECF No. 115-38), and a December, 1976 Civil Engineering article about the construction of the PUD facility (ECF No. 115-26), indicate that the tannery ceased using the sludge lagoons and began sending its waste to the PUD facility in September 1975.

But the EPA's own agent, McIntyre, confirmed in his deposition (ECF No. 123-5) that he believed the EPA reports to be true and accurate. On the basis of these reports, and his belief that they were true and accurate, McIntyre also admitted that operations after March of 1976 contributed sludge to the Lagoons Site.

- The NUS Report (ECF NO. 123-17), commissioned by the EPA, refers at page 4 to a source from MEDEP which reportedly stated that on "May 25, 1979, A.C. Lawrence transfers operations of disposal to the Paris Utility District." The Government has not objected on hearsay grounds, and on its face this statement supports an inference that New Lawrence continued to use the sludge lagoons through 1979. The strength of this inference is undermined, though not effaced, by the contradictory statement found on page 1 of the report, that, "[i]n 1975, the operation of the disposal property [Lot 24] became the responsibility of the Paris Utility District."

Ultimately, the record references in this category are sufficient to create an issue of fact regarding whether the sludge lagoons continued in use through 1977 or May 25, 1979.

## (3) <u>Miscellaneous sources also supporting Conagra's position</u>:

- The MacPhee Deposition (ECF No. 123-15): In his deposition, MacPhee avers that, based on a photograph of the sludge lagoons from 1976, it is his opinion that the sludge lagoons were still in use at this time. The Government argues that this opinion is unsupported, but there is no objection to foundation or to MacPhee opining outside of the scope of his expert designation in the

deposition itself, nor any cite to an agreement by the parties that all objections are preserved without the need for objection. Without a proper basis to exclude this opinion, it creates a material issue of fact regarding whether the sludge lagoons continued to be used in 1976.

- The March 5, 1976 memorandum of agreement (MOA) between PUD and Estech (ECF No. 123-2): This set of MOA sets forth the terms on which PUD will construct and operate the wastewater treatment facility, including obtaining funding and a landfill site from Estech, and speaks in futuristic terms about construction of the facility and conveyance of the landfill site, implying that the facility was not yet built or operating as of March 1976. But this MOA also recites that it replaces a series of earlier MOAs going back to 1970, and may simply have retained whatever language appeared in the earlier MOAs in respect to future plans for building the facility, altering only whatever language was necessary to amend the MOA. The 1973 iteration of the MOA (ECF 115-37) shows that much of the same language was in place, making it likely that the parties simply did not bother to change future tense to past tense when tweaking the MOA in 1976. Because the Court is required to make all inferences in favor of the non-moving party, it must disregard this alternative explanation for purposes of summary judgment.

**PSMF 31:** *There is no evidence that the South Paris Tannery sent waste to the sludge lagoons after the Paris Utility District began to accept its waste in September, 1975. Estech, Inc. planned to close the sludge lagoons and remove the flume over which the tanning waste had flowed.*

**CONAGRA'S RESPONSE**: *See* ConAgra's response to PSMF 30, *supra*.

**COURT DETERMINATION**: **Deemed partially admitted and partially in dispute.** *See* Court determination of PSMF ¶ 30.

**PSMF 32:** *New Lawrence allowed the Paris Utility District to deposit some sludge from the wastewater treatment process on a parcel of land it owned that was one-half mile away from the Sludge Lagoons.*

**CONAGRA'S RESPONSE**: **Qualified and Objection**. The parcel reference in the citations is vague and ambiguous. Further, the "New Lawrence" described by Plaintiff is inaccurate, please see response ¶ 4. The Paris Utility District was allowed to deposit its chromium contaminated sludge from its waste water treatment plant beginning sometime after 1977. These deposits occurred on the Lagoon Site (Lot 7, Lot 11, Lot 11.1, Lot 14 and Lot 24). (1976 MOA, Exhibit 9; Phone Record March 2007, Exhibit 16.)

"The Paris Utility District used this Site to dispose of Sludge." (Barry Dep. at

142:23-143:4, Exhibit 17.)

The Paris Utility District built two fenced landfills. One was the A.C. Lawrence Lagoon Site. (McKeown Dep. at 219:4-10, Exhibit 18.)

**COURT DETERMINATION: Objection overruled; qualification not accepted, deemed admitted**. ConAgra appears to be misquoting the Barry deposition (ECF 123-19) and McKeown Deposition (ECF No. 123-20)), which do not support ConAgra's claim that PUD dumped on Lot 7, the Lagoons Site. In the testimony referenced by ConAgra, Barry is commenting on a notation he had made: "Court has given Paris Utility access, dash, oversight." He states that in this notation he is "referring to the site where sludges were disposed of after this site was no longer used for sludge disposal." The "this site" to which Barry refers appears from the context to be the Lagoons Site. Thus, this record citation supports a finding that PUD had access to and oversight of a dump site that was *not* the Lagoons Site. In her deposition, McKeown is being asked to explain a notation of hers, that there were two fenced landfills, and that "PUD built them and took waste from the property." McKeown states that the "property" to which she was referring—the site from which PUD *took* waste—was the Lagoons Site, and that the landfills to which she referred were on lots 11 and 24—i.e. *not* the Lagoons Site (Lot 7).

**PSMF 33:** *There is no evidence to indicate that waste from the Paris Utility District was placed on the Sludge Lagoons, Lot 7.*

**CONAGRA'S RESPONSE: Denied**. Paris Utility District did place sludge on the lagoon site, Lot 7. (AECOM Expert Report, Exhibit 11; McKeown Dep. at 219:4-10, Exhibit 18; Barry Dep. at 142:23-143:4, Exhibit 17.)

**COURT DETERMINATION**: **Denial rejected, deemed admitted**. None of ConAgra's cited references support its claim that PUD dumped onto the Lagoons Site (Lot 7). Regarding the McKeown and Barry depositions, see the Court's determination regarding PSMF ¶ 32. The AECOM Expert Report (ECF No. 123-13) also contains no firsthand knowledge or opinions regarding whether PUD dumped on Lot 7.

**PSMF 34:** *The Lot 24 landfill was not part of the Removal Action performed by EPA on the Lagoons Site for which the United States now seeks costs.*

**CONAGRA'S RESPONSE: Denied and Objection**. Since the cost portion of this lawsuit has been delayed until Phase II, Grocery has conducted no discovery concerning how let alone where costs were incurred by the Plaintiff. This statement is not fully supported by the current record.

**COURT DETERMINATION**: **Denial rejected, deemed admitted; objection overruled.** The statement is fully supported by the record. The Government has limited its claim to its costs of cleanup on Lot 7.

---

**PSMF 35:** *Swift & Company incorporated in Illinois in 1885 under the name Swift and Company.*

**CONAGRA'S RESPONSE: Denied and Objection**. ¶ 18 of Plaintiff's Complaint alleges that Swift and Company incorporated in Illinois in 1885. Plaintiff is bound by the averments of its pleadings and may not simply contradict them to avoid summary judgment. *(Stefanik v. Friendly Ice Cream Corp.*, 183 F.R.D. 52 (D. Mass. 1998), Exhibit 20.) Further, Swift & Company did not incorporate in Illinois in 1885. (Swift and Company Articles, Exhibit 19.)

**COURT DETERMINATION: Denial rejected, deemed admitted; objection overruled**. ConAgra's answer (ECF No. 8) admits complaint paragraph 18, which states "Swift and Company incorporated in Illinois in 1885. In 1945, it changed its name to Swift & Company." ConAgra fails to explain how the restatement of this fact in a slightly different form makes any material difference to this case.

---

**PSMF 36:** *Swift and Company changed its name to Swift & Company in 1945.*

**Admitted**

---

**PSMF 37:** *By 1952, the A.C. Lawrence Leather Company owned several tanneries.*

**CONAGRA'S RESPONSE: Denied and Objection**. Plaintiff has not produced any deeds, testimony or documentation to support this statement of fact. Moody's (Plaintiff's Ex. PP) states only "the following list of principal plants, owned in fee (unless otherwise noted) by company and subsidiaries." It does not distinguish nor verify the owners of the properties. Further, the referenced Moody's (Plaintiff's Ex. PP) is the report for Swift & Company, not A.C. Lawrence Leather Company.

**COURT DETERMINATION: Denial rejected, deemed admitted; objection overruled**. Old Lawrence's ownership of several tanneries by 1952 is amply supported by the excerpts cited by the Government from *A Short History of the A.C. Lawrence Leather Co., Inc.* (E.J. Schneider, R.F. Goodspeed, and L.K. Barber, eds. 1982) (ECF No. 115-8).

**PSMF 38:** *By 1953, A.C. Lawrence Leather Company was a division of Swift & Company. This division was not separately incorporated.*

**CONAGRA RESPONSE: Denied.** Plaintiff's Ex. PP states that A.C. Lawrence Leather Co. was merged into Swift & Company in December of 1952. Yet, Plaintiff's Complaint at ¶19 states the A.C. Lawrence Leather Company merged into Swift & Company in December 1952. Further, Plaintiff's Ex. L states that on December 30, 1953 A.C. Lawrence Leather Company was dissolved and a liquidating trustee was appointed.

**COURT DETERMINATION: Denial rejected, deemed admitted.** ConAgra finds fault with the discrepancy between "A.C. Lawrence Leather *Co.*" and "A.C. Lawrence Leather *Company*." This is a distinction without a difference. ConAgra also points out that Old Lawrence dissolved at the end of 1953, but this supports the Government's contention that Old Lawrence was thereafter operating as a division of Swift without a separate corporate existence. Also, ConAgra's own corporate genealogy (ECF No. 116-46) asserts that Old Lawrence merged into Swift and operated as a division of Swift in December 1952.

**PSMF 39:** *On January 10, 1969, an entity named Delaware Swift & Company incorporated in Delaware.*

**CONAGRA'S RESPONSE: Denied and Objection.** Plaintiff alleges in ¶ 20 of its Complaint that: "On or about January 10, 1969, another company called Swift & Company incorporated in Delaware." Plaintiff is bound by the averments of its pleadings and may not simply contradict them to avoid summary judgment. (*Stefanik v. Friendly Ice Cream Corp.*, 183 F.R.D. 52, 54 (D. Mass. 1998), Exhibit 20; Delaware Swift & Company Incorporation, Exhibit 21.)

**COURT DETERMINATION: Denial rejected, deemed admitted; objection overruled.** In its responses to the Government's requests for admission, ¶ 8 (ECF No. 116-47) ConAgra admitted that "On January 10, 1969, an entity named Delaware Swift & Company incorporated in Delaware."

**PSMF 40:** *On February 28, 1969, Swift & Company consented to the use of its name by Delaware Swift & Company.*

**CONAGRA'S RESPONSE: Denied and Objection.** Swift & Company consented solely to the qualification of Delaware Swift & Company in the State of California. That consent was signed on February 28, 1969, Plaintiff's Ex. TT. Plaintiff alleges in ¶ 20 of its Complaint that: "The Illinois Swift & Company allowed Delaware Swift & Company to use its name." Plaintiff is bound by the averments of its pleadings and may not simply contradict them to avoid summary judgment. (*Stefanik v. Friendly Ice Cream Corp.*, 183 F.R.D. 52 (D. Mass. 1998), Exhibit 20.)

**COURT DETERMINATION: Denial rejected, deemed admitted; objection overruled**. This should be uncontroversial. The Government cites a spreadsheet created by ConAgra (ECF No. 115-47) and a letter authored by counsel for Swift, Thomas C. McGowen (who also happens to be ConAgra's counsel) (ECF No. 115-50), asserting exactly this fact. Pl's Ex. TT (ECF No. 116-48) does not indicate that Swift's consent was limited to the State of California.

---

**PSMF 41:** *On March 14, 1969, the original Swift & Company merged into Delaware Swift & Company, and the name of the surviving corporation was Swift & Company.*

**CONAGRA'S RESPONSE: Denied and Objection**. Grocery cannot discern from this statement what actual entity is intended by Plaintiff's use of the term "original" Swift & Company. On March 14, 1969, an entity, Swift & Company, did merge with Delaware Swift & Company. However, Plaintiff's statement of this fact is contrary to the allegation in paragraph ¶ 21 of Plaintiff's Complaint, wherein it is alleged: "In March 1969 the Illinois Swift & Company merged into the Delaware Swift & Company." Plaintiff is bound by the averments of its pleadings and may not simply contradict them to avoid summary judgment. (*Stefanik v. Friendly Ice Cream Corp.*, 183 F.R.D. 52, 54 (D. Mass. 1998), Exhibit 20.)

**COURT DETERMINATION: Denial rejected, deemed admitted**. ConAgra objects to the Government's differing nomenclature for the "original" Swift & Co., which the Government sometimes refers to as the "Illinois Swift & Co." In the context of the Government's pleadings, it is clear that these are the same entity.

---

**PSMF 42:** *Thereafter, until 1973, the A.C. Lawrence Leather Company operated as a division (not a separately incorporated subsidiary) of this surviving Swift & Company.*

**CONAGRA'S RESPONSE: Denied and Objection**. Grocery cannot discern the beginning time frame which Plaintiff is alleging, as a fact, with its statement "thereafter". Likewise, Grocery cannot discern whom the "surviving Swift & Company" is intended, based on the discrepancy between Plaintiff's Complaint and its Statement of Facts as set forth in paragraphs 39, 40, and 41 above.

**COURT DETERMINATION: Denial rejected, deemed admitted**. It is clear from the context (PSMF ¶¶ 38 and 41) that the Government's "thereafter" refers to from 1953 and that the "surviving Swift & Company" was the Swift that, on March 14, 1969, arose out of the merger of the original and Delaware Swifts.

**PSMF 43:** *In the early 1970s, Swift & Company engaged in four lines of business: foods, insurance and business services, chemicals and industrial products, and energy.*

**CONAGRA'S RESPONSE: Qualified**. The referenced Plaintiff Ex. WW, more accurately states:

> During fiscal 1973 Esmark, Inc. (and Swift & Company prior to April 30, 1973) engaged in four lines of business: foods, insurance and business services, chemicals and industrial products, and energy.

**COURT DETERMINATION: Denial rejected, deemed admitted.** The Government's original statement is not incorrect or misleading.

**PSMF 44:** *In December 1972, Esmark, Inc. was incorporated in Delaware. In January 1973, Esmark, Inc., Swift & Company, Estech, Inc., and certain other companies entered into an Agreement and Plan of Merger and Reorganization, which became effective in April 1973.*

**CONAGRA'S RESPONSE: Qualified and Objection**. Esmark, Inc. did not acquire the assets of Swift & Company and its subsidiaries pursuant to the Agreement and Plan of Merger and Reorganization. Plaintiff's Ex. M. Contrary to L.R. 56(b) this Statement of Material Fact asserts more than one fact.

**COURT DETERMINATION: Qualification rejected, deemed admitted; objection overruled.** This paragraph contains three separate statements, in contravention of L.R. 56(b)—but, there are citations to each part, so this does not materially affect ConAgra's ability to respond. ConAgra's qualification is non-responsive.

**PSMF 45:** *Pursuant to the Agreement and Plan of Merger and Reorganization, another company named Delaware Swift & Company merged into Swift & Company, and the surviving company, named Swift & Company, transferred all of its non-food assets into newly created subsidiaries of Esmark.*

**CONAGRA'S RESPONSE: Denied**. "Esmark" as stated by Plaintiff herein, cannot be a viable corporate entity because it is lacking the statutorily required corporate "designation" such as "Inc.", "Corp.", etc. Further, "Esmark" is not a party to Plaintiff's Ex. M.

**COURT DETERMINATION: Denial rejected, deemed admitted**. Taken in context, *see* PSMF ¶ 44, the Government supplies the needed corporate designation for Esmark: "Inc." The 1973 Agreement and Plan of Merger and Reorganization does indeed list "Esmark, Inc." in the first paragraph of the preamble as a party to

that agreement.

**PSMF 46:** *Pursuant to the Agreement and Plan of Merger and Reorganization, Swift & Company transferred its A.C. Lawrence Leather Company division to Estech, Inc., one of the newly-created subsidiaries of Esmark.*

**CONAGRA'S RESPONSE: Denied.** "Esmark" as stated by Plaintiff herein, cannot be a viable corporate entity because it is lacking the statutorily required corporate "designation" such as "Inc.", "Corp.", etc. Further, "Esmark" is not a party to Plaintiff's Ex. M.

**COURT DETERMINATION: Denial rejected, deemed admitted**. *See* Court Determination of PSMF ¶ 45.

**PSMF 47:** *Pursuant to the Agreement and Plan of Merger and Reorganization, all assets and liabilities associated with the A.C. Lawrence Leather Company division were transferred intact to Estech, Inc. Specifically, Article 4 of the Agreement and Plan of Merger and Reorganization that governed the corporate reorganization stated:*

> *Each of [Esmark's new subsidiaries] will assume the liabilities relating to the business or businesses acquired by it (through ownership of stock where stock of subsidiary companies is acquired and by the express assumption of such liabilities where assets other than stock are acquired) but will not assume any of Swift's long-term debt or any other liabilities of Swift which are not associated with such businesses.*

*(Emphasis added.)*

**CONAGRA'S RESPONSE: Denied**. All assets may not have been acquired. Plaintiff's Ex. M refers to "All or substantially all of the assets." No bill of sale or similar transfer document has ever been provided showing what assets, if any, were acquired/Transferred.

All liabilities were not assumed. The quoted language above specifically states that there was no assumption of long term debt and "other liabilities of Swift which are not associated with such business". The quoted language provides that (Esmark's new subsidiaries) will assume the liabilities." Further the latter quote is a futuristic statement. It is unknown what liabilities, if any, were ultimately assumed or if such liabilities were transferred "intact".

Plaintiff failed to provide any documentation or testimony whereby, whatever subsidiary(ies) Plaintiff claims of Esmark, Inc. (pursuant to Plaintiff's Ex. M) would

assume any such liabilities. Likewise, there has been no documentation or testimony provided, or known by Grocery to exist, whereby the liabilities of A.C. Lawrence Leather Company would have been assumed by one of these subsidiaries.

**COURT DETERMINATION:** The language of the contract is **deemed admitted**. As to the acquisition of assets, *see* Court Determination regarding PSMF ¶ 3. The language of the Plan of Merger and Reorganization regarding liabilities speaks for itself.

**PSMF 48:** *In 2007, ConAgra's attorney submitted a letter to the Environmental Protection Agency ("EPA") in response to EPA's Notice of Potential Liability to Swift & Company.*

**CONAGRA'S RESPONSE: Denied**. Counsel for Swift and Company (pursuant to agreement) responded to the notice letter. Plaintiff's Ex. UU at ACL_EPA054422.

**COURT DETERMINATION: Denial partially accepted, deemed qualified, fact modified**. The fact should read that the 2007 letter was written by Swift and Company's attorney.

**PSMF 49:** *Throughout Estech's ownership of the South Paris Tannery and the Sludge Lagoons, the A.C. Lawrence Leather Company remained a division (not a separately incorporated subsidiary) of Estech and continued operations at the South Paris Tannery.*

**CONAGRA'S RESPONSE: Denied**. "Estech", as stated by Plaintiff herein, cannot be a viable corporate entity because it is lacking the statutorily required corporate "designation" such as "Inc.", "Corp.", etc. Further, A.C. Lawrence Leather Company was in fact incorporated in 1897. (A.C. Lawrence Leather Company Incorp., Exhibit 22.). Further, "Estech" never owned the subject property.

**COURT DETERMINATION: Denial rejected, deemed admitted**. *See* Court Determination of PSMF ¶ 45.

**PSMF 50:** *On March 5, 1976, pursuant to an Agreement of Purchase and Sale, Estech, Inc. sold a portion of the business, property, and assets of its A.C. Lawrence Leather Company division to New Lawrence.*

**CONAGRA'S RESPONSE: Qualified**. Per Plaintiff's ¶ 4 of this Statement of Undisputed Material Facts, Plaintiff has erroneously designated "New Lawrence" as A.C. Lawrence Leather Company, Inc. The March 1976 Agreement was by and between Estech, Inc. and A.C. Lawrence Leather Co., Inc. Plaintiff's Ex. XX. Further, in ¶ 28 of Plaintiff's Complaint, Plaintiff alleges that "On or about March 5, 1976, Estech, Inc., sold certain real property and assets of its A.C.

Lawrence Leather Company division." Plaintiff is bound by the averments of its pleadings and may not simply contradict them to avoid summary judgment. (*Stefanik v. Friendly Ice Cream Corp.*, 183 F.R.D. 52 (D. Mass. 1998), Exhibit 20.) In return for the purchase of all the assets, New Lawrence assumed all liabilities and obligations of A.C. Lawrence Leather Company from Estech, Inc. excepting only labor, employment contracts or pension and profit sharing plans and in addition these same parties entered into an assumption agreement of even date.

**FOOTNOTE 1**: Grocery maintains that, consistent with the March 5, 1976 Agreement (Plaintiff's Ex. XX), the Assumption Agreement (Assumption Agreement, Exhibit 23; Abate Dept. at 67:17-22, Exhibit 2.) of even date, and the expert report of Jeffrey A. Thaler (Thaler Expert Report, Exhibit 24.), all debts, liabilities, obligations and commitments were assumed and undertaken by "New Lawrence".

These agreements make it clear that "New Lawrence" assumed all debts, liabilities, obligations and commitments (whether fixed, contingent, accrued or otherwise) of Estech, Inc. in respect of "Old Lawrence" "except for liabilities" defined in excluded liabilities in this Agreement" those excluded liabilities are set forth in ten subparagraphs of page 12 and 13 of the Agreement and none of those pertain in any way to the South Paris, Maine, tannery operations and environmental discharges that are referenced in Plaintiff's Complaint.

Thus Grocery, rather than reiterate this "qualification" for each following applicable paragraphs of its Response will simply footnote each response where this "qualification" is necessary to alert the Court, that Grocery is not waiving or admitting that Grocery believes, admits, or otherwise acquiesces that any liabilities, specifically CERCLA, and or liability for this Site were transferred, assumed, merged or otherwise acquired by Grocery in admitting certain filings occurred in this response.

**COURT DETERMINATION: Qualifications rejected, deemed admitted**.

Regarding the first qualification, *see* Court Determination regarding PSMF ¶ 4.

Regarding ConAgra's assertion that the complaint conflicts with this statement, there is no material difference between paragraph 28 of Plaintiff's Complaint, "On or about March 5, 1976, Estech, Inc., sold certain real property and assets of its A.C. Lawrence Leather Company division," and the instant statement of fact.

Regarding fn. 1: ConAgra's assertion that Estech divested itself of its CERCLA liability in the sale to New Lawrence is contrary to law. *See* 42 U.S.C. § 9607(e)(1) ("No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any

person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section."); *Boyd*, 992 F.2d at 405.

**PSMF 51:** *As part of the March 1976 sale, Estech, Inc. sold the real property encompassing the South Paris Tannery and the lagoons at the Lagoons Site to New Lawrence.*

**CONAGRA'S RESPONSE: Qualified.**[SEE FN 1 of ConAgra's response to PSMF ¶ 50] Per Plaintiff's ¶ 4 of its Statement of Undisputed Material Facts, Plaintiff has erroneously designated "New Lawrence" as A.C. Lawrence Leather Company, Inc. Further, Plaintiff's Ex. XX was by and between Estech, Inc. and A.C. Lawrence Leather Co., Inc.

**COURT DETERMINATION: Denial rejected, deemed admitted**. *See* Court Determination regarding Conagra's response to PSMF ¶ 4.

**PSMF 52:** *In 1981, Estech, Inc., which had incorporated in Delaware on December 12, 1972, changed its name to Estech Investments, Inc.*

**Admitted**

**PSMF 53:** *Since the 1973 Agreement and Plan of Merger and Reorganization, Estech had been owned by Esmark, Inc.*

**CONAGRA'S RESPONSE: Denied**. Grocery does not know nor can it ascertain the end date based on Plaintiff's statement of "Since the 1973…" "Estech", as stated by Plaintiff herein, cannot be a viable corporate entity because it is lacking the statutorily required corporate "designation" such as "Inc.", "Corp.", etc. Further, "Estech" is not a party to the referenced 1973 Agreement.

**COURT DETERMINATION: Denial rejected, deemed admitted**. The Government is not required to assert an end date, but in any event, the date is described in PSMF ¶ 55. Regarding the use of "Estech" without its corporate "Inc." designation, the context (PSMF ¶ 52), supplies the needed corporate designation.

**PSMF 54:** *In August 1984, Beatrice Companies, Inc. acquired Esmark.*

**CONAGRA'S RESPONSE: Denied**. "Esmark", as stated by Plaintiff herein, cannot be a viable corporate entity because it is lacking the statutorily required corporate "designation" such as "Inc.", "Corp.", etc. Further, "Esmark" is not the entity listed in Plaintiff's Ex. WW.

**COURT DETERMINATION: Denial rejected, deemed admitted**. *See* Court Determination regarding PSMF ¶ 45. ConAgra admits this fact in its answer to ¶

| |
|---|
| 30 of the Complaint. |
| **PSMF 55:** *In 1986, all of the stock of Estech Investments, Inc. was transferred to Beatrice Companies, Inc.*<br><br>**Admitted** |
| **PSMF 56:** *On or about February 27, 1987, Beatrice Companies, Inc. transferred the stock of Estech Investments, Inc. to a company called BCI Divestiture, Inc.*<br><br>**Admitted** |
| **PSMF 57:** *Sometime before February 28, 1989, BCI Holdings Corp. changed its name to Beatrice Company.*<br><br>**CONAGRA'S RESPONSE: Denied**. Grocery is not aware of any entity ever incorporated entitled "BCI Holdings Corp." Plaintiff's Ex. ZZ.<br><br>**COURT DETERMINATION: Denial rejected, deemed admitted**. Pl's Ex. ZZ (ECF No. 116-54), which is the 1989 annual 10-K report for Beatrice Company, notes: "'Beatrice' refers to Beatrice Company, formerly BCI Holdings Corporation, a Delaware corporation formed in 1985."<br><br>ConAgra appears to contest the discrepancy between the names "BCI Holdings Corporation" and "BCI Holdings Corp." but does not explain why this distinction makes any difference. |
| **PSMF 58:** *As of August 14, 1990, BCI Divestiture, Inc. (Estech Investment, Inc.'s parent company) was owned by Beatrice U.S. Food Corp., which was owned by Beatrice Company.*<br><br>**Admitted** |
| **PSMF 59:** *On June 7, 1990, ConAgra, Inc., entered into an agreement to purchase Beatrice Company for approximately $1.3 billion.*<br><br>**Admitted** |
| **PSMF 60:** *On August 14, 1990, Beatrice Company merged into a company named CAGSUB, Inc. (a subsidiary of ConAgra, Inc.), with the surviving corporation changing its name to Beatrice Company, and ConAgra, Inc. acquired Beatrice Company.*<br><br>**CONAGRA'S RESPONSE: Qualified**. [SEE FN 1 of ConAgra's response to PSMF |

¶ 50]. The "shareholders equity component" of Beatrice Company's balance sheet could not have been combined with the balance sheet of CAGSUB, Inc. [SEE ALSO FN 2 below.]

**FOOTNOTE 2**: There are three components to every balance sheet: assets, liabilities and shareholder/owner equity. In mergers, the latter does not transfer nor is it combined. Thus, rather than reiterate this qualification throughout the balance of its responses, Grocery will use this footnote to deny that the shareholder/owner equity components of the balance sheets of merged entities were combined as a result of the mergers referenced by Plaintiff.

**COURT DETERMINATION: Qualifications rejected, deemed admitted**. Regarding fn. 1, *see* Court Determination regarding to PSMF ¶ 50.

Regarding fn. 2, ConAgra instructs the Court, without record citations or citation to legal authority, that the "shareholder equity" portion of the balance sheets of merged entities do not merge. This unsubstantiated assertion is not accepted.

**PSMF 62:** *Shortly thereafter, on May 24, 1991, Estech Investments, Inc. merged into BCI Divestiture, Inc.*

**CONAGRA'S RESPONSE: Qualified**. [SEE FN 1 of ConAgra's response to PSMF ¶ 50, and FN 2 of ConAgra's response to PSMF ¶ 60.] Grocery cannot ascertain what the time frame the Plaintiff is attempting to state by the term "Shortly thereafter." Further, Estech Investments, Inc. merged into BCI Divestiture, Inc. on July 29, 1991. (Certificate of Merger July 1991, Exhibit 25.)

**COURT DETERMINATION: Qualifications rejected, deemed admitted.** *See* Court Determination with respect to PSMF ¶¶ 50 (fn. 1) and 60 (fn. 2). It is clear from the context "shortly thereafter" refers to shortly after Beatrice Company merged into CAGSUB, Inc. on August 14, 1990. *See* PSMF ¶ 60. The certificate of merger (ECF No. 123-27) was filed with Delaware's secretary of state on July 29, 1991, but the merger actually occurred on May 24, 1991. Certificate of Merger at 1 and 3.

**PSMF 63:** *On February 24, 1992, BCI Divestiture merged into Beatrice U.S. Food Corp.*

**CONAGRA'S RESPONSE: Denied**. [SEE FN 2 of ConAgra's response to PSMF ¶ 60]. "BCI Divestiture" as stated by Plaintiff herein, cannot be a viable corporate entity because it is lacking the statutorily required corporate "designation" such as "Inc.", "Corp.", etc. (Certificate of Ownership Feb. 1992, Exhibit 26.) Further, "BCI Divestiture" did not merge into Beatrice U.S. Food Corp.

**COURT DETERMINATION: Denial rejected, deemed admitted**. It is clear from the context that the "BCI Divestiture" to which the Government refers is BCI Divestiture, Inc. *See* PSMF ¶ 62. ConAgra admits that this company merged into Beatrice U.S. Food Corp. *See* ConAgra's March 11, 2011 response to the Government's Supplemental Request for Information 7 (ECF No. 116-53).

---

**PSMF 64:** *On or about September 24, 1993, Beatrice U.S. Food Corp. merged into Beatrice Company.*

**CONAGRA'S RESPONSE: Qualified**. [SEE FN 2 of ConAgra's response to PSMF ¶ 60.]

**COURT DETERMINATION: Qualification rejected, deemed admitted**. *See* Court Determination regarding ConAgra's response to PSMF ¶ 60, fn. 2.

---

**PSMF 65:** *On September 24, 1993, Beatrice Company merged into Hunt-Wesson, Inc.*

**CONAGRA'S RESPONSE: Qualified**. [SEE FN 2 of ConAgra's response to PSMF ¶ 60.]

**COURT DETERMINATION: Qualification rejected, deemed admitted**. *See* Court Determination regarding ConAgra's response to PSMF ¶ 60, fn. 2.

---

**PSMF 66:** *On July 19, 1999, Hunt-Wesson, Inc. changed its name to ConAgra Grocery Products Company.*

**CONAGRA'S RESPONSE: Denied and Objection**. Plaintiff alleges in ¶ 38 of its Complaint: "On or about July 19, 1999, Hunt-Wesson, Inc., changed its name to ConAgra Grocery Products Company, Inc." Plaintiff is bound by the averments of its pleadings and may not simply contradict them to avoid summary judgment. (*Stefanik v. Friendly Ice Cream Corp.*, 183 F.R.D. 52, 54 (D. Mass. 1998), Exhibit 20; Certificate of Amendment July 1999, Exhibit 27.)

**COURT DETERMINATION: Denial rejected, deemed admitted; objection overruled.** The only differences between the complaint and PSMF ¶ 66 are the removal from PSMF ¶ 66 of the words "or about" and "Inc." The removal of "or about" is not inconsistent, merely more precise. While ConAgra seems to find the difference between "ConAgra Grocery Products Company" and "ConAgra Grocery Products Company, Inc." significant, it does not actually argue that these are two different entities and that the Government has identified the wrong one.

---

**PSMF 67:** *On or about December 31, 2000, ConAgra Grocery Products Company merged into International Home Foods, Inc.*

**Admitted**

**PSMF 68:** *International Home Foods changed its name to ConAgra Grocery Products Company after the December 31, 2000 merger.*

**CONAGRA'S RESPONSE: Denied**. "International Home Foods", as stated by Plaintiff herein, cannot be a viable corporate entity because it is lacking the statutorily required corporate "designation" such as "Inc.", "Corp.", etc. (Certificate of Merger Dec. 2000, Exhibit 28.) Further, "International Home Foods" did not change its name to ConAgra Grocery Products Company.

**COURT DETERMINATION: Denial rejected, deemed admitted**. The context clearly indicates that the "International Home Foods" to which the Government refers is "International Home Foods, Inc." *See* PSMF ¶ 67. ConAgra admitted that International Home Foods, Inc. changed its name to ConAgra Grocery Products Company after the December 2000 merger at paragraphs 4 and 5 of its December 12, 2013 admissions (ECF No. 116-47).

**PSMF 69:** *On or about May 29, 2005, ConAgra Grocery Products Company converted to a limited liability company and changed its name from ConAgra Grocery Products Company to ConAgra Grocery Products Company, LLC.*

**CONAGRA'S RESPONSE: Denied and Objection**. This Statement of Fact is contrary to ¶ 39 of Plaintiff's Complaint wherein Plaintiff alleges: "On or before November 22, 2005, ConAgra Grocery Products Company, Inc., was converted to a limited liability company with the name ConAgra Grocery Products Company, LLC." Plaintiff is bound by the averments of its pleadings and may not simply contradict them to avoid summary judgment. (*Stefanik v. Friendly Ice Cream Corp.*, 183 F.R.D. 52 (D. Mass. 1998), Exhibit 20.)

**COURT DETERMINATION: Denial rejected, deemed admitted; objection overruled**. ConAgra admits this fact at ¶ 6 of its December 12, 2013 admissions (ECF No. 116-47), but tries to reject it on summary judgment because the date now cited by the Government (to which ConAgra admitted) is not the same date the Government recites in its complaint.

**PSMF 70:** *In 2000, the Town of South Paris received a complaint regarding the presence of "green ooze" on the bank of the Little Androscoggin River at the location of the sludge lagoons.*

**CONAGRA'S RESPONSE: Qualified**. The exhibits/sources cited do not place the "green ooze" at the location of the sludge lagoons.

**COURT DETERMINATION: Qualification partially accepted, fact modified**.

The March 27, 2013 McKeown Declaration at ¶ 9 (ECF No. 116-59) avers that the complaint regarded green ooze "*near* the Lagoons Site" (emphasis added.)

**PSMF 71:** *In 2002 and 2003, Maine Department of Environmental Protection ("MEDEP") conducted sampling at the Site that confirmed a widespread layer of contaminated sludge located approximately 2 to 3 feet below ground surface (bgs). Approximately 26 surface and subsurface soil samples and groundwater samples were collected by MEDEP. Groundwater samples were collected from on-site monitoring wells. Analytical results indicated that the maximum concentration of chromium in soil was 209,000 parts per million (ppm).*

**CONAGRA'S RESPONSE: Denied and Objection**. Contrary to L.R. 56(b) this Statement of Fact contains more than one fact. Moreover, these factual statements are not correct.

The MEDEP did not perform 26 subsurface soil samples, and no detailed groundwater study was performed. "The State had tested for chromium and they ranged, the average was about 50,000 parts per million, and the maximum detections were, I believe, 130,000 parts per million and that was from the limited amount of bore holes they put on the site. I think it was about 15 to 20." (Barry Dep. at 37:19-38:13, Exhibit 17.)

"No one performed a detailed groundwater study during the investigation." (Barry Dep. at 74:20-21, Exhibit 17.)

The limited sampling that was conducted did not reveal widespread contamination. "Groundwater was not a threat." (McIntyre Dep. at 49:5-12, Exhibit 3.)

"Q: To your knowledge at this site, was any sediment ever removed? A: Not to my knowledge. I was –- that was after I was reassigned from the project." (Barry Dep. at 55:16-19, Exhibit 17,)

**COURT DETERMINATION: Objection overruled.** Both sides have on occasion included more than one fact per statement. **Denial accepted, fact in dispute**. ConAgra raises issues of fact with regard to the amount of contamination at the site, as well as the amount of testing performed by the Government. But PSMF ¶ 71 is not material to liability, except to show that there was some contamination, which it does.

**PSMF 72:** *In September of 2003, a Preliminary Assessment was conducted at the Site. EPA's contractor Weston Solutions, Inc. and EPA, along with MEDEP, conducted sampling along the riverbank of the Site, confirming widespread chromium contamination. Chromium levels ranged from 13 ppm to 48,000 ppm and with chromium levels exceeding 5,000 ppm in a majority of the samples. Chromium*

*was also detected in the river sediment at levels up to 200 ppm.*

**CONAGRA'S RESPONSE: Qualified**. Chromium contamination did not rise to EPA action levels for residential areas. "A: EPA's level at the time for residential was 100,000 parts per million. Q: Just so I am understanding this, residential was 100,000 parts per million and you were finding a maximum of 50,000. A: Along the river bank. (Barry Dep, at 57:3-16, Exhibit 17.)

**COURT DETERMINATION: Qualification accepted, admitted as qualified.**

**PSMF 73:** *On May 17 through May 19, 2006, EPA's New England Regional Laboratory (NERL) advanced 31 soil borings to determine the depth of contamination in the former sludge lagoons at the Lagoons Site.*

**Admitted**

**PSMF 75:** *From August 2006 through September of 2007, EPA and its contractors conducted a variety of removal action activities for the Site that generally included:*
> *a. Grubbing and clearing the Site.*
> *b. Setting up an office trailer, decontamination zone, soil staging areas, and equipment.*
> *c. Excavation and segregation of uncontaminated soil used to cap the former sludge lagoons from the contaminated soil.*
> *d. Excavation and staging of contaminated soil and sludge from the former lagoons and riverbank.*
> *e. Shipment of approximately 34,000 tons of contaminated soil to an offsite location for proper disposal.*
> *f. Backfill of excavated area with uncontaminated soil from the site as well as offsite fill material.*
> *g. Grading the site and repairing the riverbank.*

**CONAGRA'S RESPONSE: Qualified and Objection**. This statement is beyond the scope of Phase I. Nevertheless, Grocery admits generally the referenced work was performed. However, Grocery denies that the release(s) alleged against Grocery were the cause of these removal activities. Further, Grocery denies the referenced work was consistent with the National Contingency Plan.

**COURT DETERMINATION: Qualification accepted, objection sustained in part**. Other than to establish that the Government undertook a removal action, this information is not material to liability.

**PSMF 76:** *After excavation of the contaminated soil was complete, the Lagoons Site was backfilled with uncontaminated soil.*

**Admitted**

| |
|---|
| **PSMF 77:** *EPA demobilized from the Lagoons Site in September 2007.* <br><br> **Admitted** |
| **PSMF 78:** *On August 25, 2010, Plaintiff and Defendant entered into a tolling agreement, which established a period (the "Tolling Period") from August 31, 2010 to February 28, 2011, which shall not be included in computing the running of the statute of limitations potentially applicable to Plaintiff's claims against Defendant, pursuant to Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607, 9613, in the above-captioned action.* <br><br> **Admitted** |
| **PSMF 79:** *January 19, 2011, Plaintiff and Defendant entered into an amended tolling agreement, which extended the Tolling Period until May 31, 2011.* <br><br> **Admitted** |
| **PSMF 80:** *April 20, 2011, Plaintiff and Defendant entered into a second amended tolling agreement, which extended the Tolling Period until November 30, 2011.* <br><br> **Admitted** |

| |
|---|
| **CONAGRA'S STATEMENTS OF FACT** |
| **DSMF 5:** *Paris Tannery; Ward Brothers Tannery; and A.C. Lawrence Leather Co., Inc. ("New Lawrence") were all owners and operators of the tannery and utilized the waste lagoons at the Site.* <br><br> **GOVERNMENT'S RESPONSE: Qualified**. <br><br> The United States **admits** that Paris Tannery and Ward Brothers Tannery are entities that may have owned and operated the South Paris Tannery and/or the sludge lagoons at some time prior to Swift & Company's opening of the A.C. Lawrence Leather Company division at the South Paris Tannery in 1955. <br><br> Further, the United States **admits** that A.C. Lawrence Leather Co., Inc. owned and operated the South Paris Tannery after it bought the South Paris Tannery from Estech, Inc. in March 1976. |

However, the United States **denies** that A.C. Lawrence Leather Co., Inc. operated or utilized the sludge lagoons during its ownership of the South Paris Tannery. Plaintiff's Statement of Facts in Support of its Motion for Summary Judgment ("Plaintiff's MSJ SOF"), ECF No. 116-1, at ¶ 30, 31. The evidence establishes that the sludge lagoons ceased operating when Paris Utility District opened and began accepting waste from the South Paris Tannery in September of 1975. *Id.*

The United States **objects** to this alleged fact on the basis of relevance, as explained herein General Objections ¶¶ 1, 2, 3. These documents describe only the Paris Utility District ("PUD")'s use of property owned by A.C. Lawrence Leather Co., Inc. for the disposal of PUD's sludge. The site referenced in those documents is the Landfill Site, not the Lagoons Site at issue in this litigation. In addition, whether other entities owned or operated the South Paris Tannery and sludge lagoons prior to Swift & Company or after Estech, Inc. is not relevant to the Liability Phase of this litigation.

**COURT DETERMINATION: Objection overruled, denial accepted, fact disputed**. This fact is relevant to establish background information in this case, but its contention that New Lawrence used the sludge lagoons is disputed.

---

**DSMF 10:** *The PUD built two fenced landfills, one of those was this A.C. Lawrence Lagoon Site.*

**GOVERNMENT'S RESPONSE: Denied**. This factual allegation is not supported by the record material to which Defendant cites. The cited portion of Ms. McKeown's deposition does not establish that one of the fenced landfills referenced in Ms. Hennessy's March, 26 2007 Phone Record was the Lagoons Site, nor does it support the inference that the Lagoons Site was built by PUD. To the contrary, based on the deposition transcript, Ms. McKeown appears to have interpreted the reference to "prop." in Ms. Hennessy's March 26, 2007 Phone Record to mean "property," which Ms. McKeown understood to be the Lagoons Site. Nowhere did Ms. McKeown agree or testify that either of the two "fenced landfills" was the Lagoons Site or that the PUD "built" the Landfill Site. Indeed, when asked generally whether she found the notes to be "true and accurate to the best of your memory," Ms. McKeown responded "I can't answer that. . . . I don't know if its [] accurate." Plaintiff's MSJ, Ex. MMM, McKeown Dep. at 218: 2-24, 219:1-22.

The United States objects to this alleged fact because it is supported by inadmissible hearsay, as explained herein in Plaintiff's General Objection ¶ 7. The meaning of the March 26, 2007 Phone Record on which Defendant relies is unclear. The notes are in shorthand and in incomplete sentences. Defense Counsel had ample opportunity to show the March 26, 2007 Phone Record to their author, Ms. Hennessy, during her deposition, but he did not show them to her, nor did he seek

information about their meaning. It is only Ms. Hennessy who could have testified with first-hand knowledge about the meaning and intent of the March 26, 2007 Phone Record.

In addition, the United States objects to this alleged fact because it creates confusion between the Lagoons Site, at issue in this case, and the Landfill Site, as explained herein in Plaintiff's General Objection ¶ 3.

**COURT DETERMINATION: Denial accepted, fact rejected.** *See* Court determination regarding PSMF ¶ 32.

---

**DSMF 14:** *Even after 1977 when portions of the waste were sent to PUD the solids from the Tannery were mechanically removed by the Tannery plant as part of New Lawrence's pretreatment requirement, prior to the remainder (mostly liquid) of the waste being sent to the PUD. These waste solids (sludge) continued to be disposed of at the lagoon site until 1979. (Civil Engineering Article, Exhibit 32.)*

**GOVERNMENT'S RESPONSE:** Contrary to L.R. 56(b), this alleged fact asserts more than one factual allegation. As such, the United States asserts the following qualifications, admissions and denials:

**Denied**. The record material to which Defendant cites does not support the factual assertion made. As explained herein in the Plaintiff's Opposition to Defendant's Statement of Fact 13, Defendant's Exhibit 32, the only source on which it relies to support this alleged fact, is dated December 1976. Thus, the record citation could not and does not support the allegation that efforts were made to remove solids from the tannery waste at any time after 1976.

In addition, the United States denies that solids were disposed of at the Lagoons Site until 1979. Although, the United States admits that the South Paris Tannery made efforts to remove solids from the waste stream going to the PUD prior to the publication of Defendant's Exhibit 32 in 1976, the Defendant has not cited to any record material that indicates that those solids were disposed of at the Lagoons Site at any time. To the contrary, the record indicates that any such solids removed were placed on the Landfill Site. Plaintiff's MSJ, Ex. PPP, Abate Dep. at 43:9-25, 44:1. Moreover, the Lagoons Site was no longer in use after the South Paris Tannery connected to the PUD in September of 1975. Plaintiff's MSJ SOF, ECF No. 116-1, at ¶¶ 30-31.

The United States objects to this alleged fact on the basis of relevance. The alleged fact creates confusion between Lagoons Site, at issue in this case, and the Landfill Site, as explained herein in Plaintiff's General Objection ¶ 3. Further, the United States objects to this alleged fact because it is inconsistent with Defendant's allegations that the sludge lagoons ceased receiving waste in 1977 and 1985. *See*

Defendant's MSJ SOF, ECF No. 122-1 at ¶¶ 15, 16, 18.

**COURT DETERMINATION: Denial accepted, fact rejected.** The December 1976 Civil Engineering article (ECF No. 116-25) does not indicate where solids removed by New Lawrence were dumped.

---

**DSMF 15:** *The Site was used through 1977 and in certain instances until 1979. (Simmons Dep. at 48:16-18 Exhibit 33.)*

**GOVERNMENT'S RESPONSE: Denied**. The record material to which Defendant cites does not support the factual assertion made. The cited testimony of Defendant's expert Simmons merely states "I think it is unclear what the last date is, that both 1977 and 1979 appear in EPA documents." In addition, Simmons' testimony is not based on his review of documents that are contemporaneous with the closure, which state that the South Paris Tannery ceased using the sludge lagoons in 1975. Plaintiff's MSJ, Ex. NNN, May 30, 2013 McKeown Declaration, at ¶ 6-8.

The United States objects to this alleged fact on the basis of relevance, as explained herein in Plaintiff's General Objection ¶ 2 and on the basis of reliability as explained in Plaintiff's Motion *In Limine* to Exclude Testimony of Douglas Simmons and Craig MacPhee (ECF No. 118), and its supporting Reply brief filed herewith. In addition, the United States objects to this alleged fact because it is supported only by the opinion of a witness who has not yet been qualified to testify as an expert in this case, as further explained herein in Plaintiff's General Objections ¶ 6.

**COURT DETERMINATION: Denial accepted, fact rejected.** Douglas Simmons, one of Conagra's experts, merely repeats information contained in EPA documents in his deposition (ECF No. 122-35). Simmons is not an independent source of this information.

---

**DSMF 16:** *New Lawrence continued to contribute industrial waste to the lagoon site until June 1st of 1979. (Hennessy Dep. at 75: 12-24; 76:1-9 Exhibit 8; Johnson, III 30(b)(6) "Consent Decree" Dep. at 43:20-22, 50:7-10, Exhibit 35; History of Site, Exhibit 34.)*

**GOVERNMENT'S RESPONSE: Denied**. The record material to which Defendant cites does not support the factual assertion made. For example, the cited portions of Ms. Hennessy's deposition reflect that Ms. Hennessy was instructed to read directly from a document, which appears to be a portion of Defendant's Exhibit 34. Importantly, she was not asked to opine on whether the statement that she was asked to read is accurate. To the contrary, she explicitly stated that she did not know where "industrial" waste went prior to June 1, 1979. Plaintiff's MSJ, Ex. QQQ, Hennessy Dep. at 75:6-9.

Defendant's Exhibit 34 does not support the fact alleged. That document is untitled and undated; however, based on the dates and context, including references to Ryerson Hill, which was considered as an alternative to the Landfill Site for the disposal of PUD's waste, it appears that the "site" it references is the Landfill Site, not the sludge lagoons. Even if it were a narrative of the Lagoons Site, it contains no statement that any closure occurred on June 1, 1979. Instead, it states that, although BEP ordered the [Landfill] Site closed to sludge disposal by June 1, 1979, the PUD continued to operate the Site through December 30, 1985. Defendant's MSJ SOF, Ex. 34, ECF 122-36, at ACL_EPA032216.

Neither does the cited testimony of Mr. Johnson support the fact alleged. The cited portions of Mr. Johnson's deposition reflect only that Mr. Johnson was asked by Defense Counsel to read from documents presented to him during his deposition. The first document from which Mr. Johnson was asked to read is a 1989 report prepared in furtherance of the PA/SI EPA performed at the Landfill Site. Plaintiff's MSJ, Ex. RRR, NUS PA, at ACL_EPA227734-38. Likewise, the second document from which Mr. Johnson was asked to read, Defendant's Exhibit 34, does not support the fact alleged, as described herein. Furthermore, Mr. Johnson was not asked to opine on the truth of the statements contained in those documents.

The United States objects to this alleged fact on the basis of relevance, as explained herein in Plaintiff's General Objection ¶ 2. Whether the Lagoons Site was used through 1979 is an inquiry that is not relevant to the Liability Phase of this litigation. Further, the United States objects to this alleged fact because it is inconsistent with Defendant's allegation that the sludge lagoons ceased receiving waste in 1977 and 1985. Defendant's MSJ SOF, ECF No. 122-1 at ¶¶ 15, 18.

**COURT DETERMINATION: Denial accepted, fact rejected.** In the cited portion of Tina Hennessy's deposition (ECF No. 122-10), Hennessy is asked to read a portion of a document. She does not testify that New Lawrence continued to use the Lagoons Site through June 1, 1979.

Likewise, in the cited portion of Arthur Johnson III's deposition (ECF No. 122-37), Johnson is asked to read a portion of a document. He does not testify that New Lawrence continued to use the Lagoons Site through June 1, 1979.

The History of Site (ECF No. 122-36) nowhere discusses use of the Lagoons Site. It discusses another lot, "a 24 acre parcel (Map R-2, # 14)", which, according to this document, MEDEP ordered to be closed on August 1, 1978, but which PUD continued to use from June 1, 1979 through December 30, 1985.

**DSMF 17:** *The Site was used through 1977 and in certain instances the waste lagoons continued to be used until when New Lawrence transferred all operations of*

*its waste disposal to PUD. (Simmons Dep. at 48:16-18; 55:6-8; 55:21-22, Exhibit 33; Civil Engineering Article, Exhibit 32.)*

**GOVERNMENT'S RESPONSE**: Contrary to L.R. 56(b), this alleged fact asserts more than one factual allegation. As such, the United States asserts the following qualifications, admissions and denials:

**Qualified**. The United States denies that the sludge lagoons at the Lagoons Site were used for disposal of Tannery waste through 1977. Any such allegations are unsupported by the record citation for the reasons discussed herein in the Plaintiff's Opposition to Defendant's SOF ¶¶ 15 and 16, in Plaintiff's Motion *In Limine* to Exclude Testimony of Douglas Simmons and Craig MacPhee (ECF No. 118), and its supporting Reply brief filed herewith. The United States admits that the sludge lagoons were used by the South Paris Tannery until PUD began to accept the South Paris Tannery's waste in September of 1975. Plaintiff's MSJ SOF, ECF No. 116-1, at ¶¶ 30-31. In addition, the United States objects to this alleged fact on the basis of relevance, as explained herein in Plaintiff's General Objection ¶ 2, and on the basis of reliability, as explained in Plaintiff's Motion *In Limine* to Exclude Testimony of Douglas Simmons and Craig MacPhee (ECF No. 118), and its supporting Reply brief filed herewith.

**COURT DETERMINATION: Denial accepted, fact rejected.** For the reasons discussed in the Court's Determination regarding DSMF ¶ 15, Simmons's testimony is not evidence of the statement proposed.

ConAgra does not pinpoint any part of the December 1976 Civil Engineering Article (ECF No. 115-26) in support of its statement. The article, under subheading "Problems overcome" indicates that PUD was activated in September 1975 and began receiving waste from the tannery at that time. It does not mention the sludge lagoons nor can their continued use for any amount of time after PUD was activated be inferred from this article.

**DSMF 18**: *The waste lagoons continued to be in use until the tannery closed. (Everett Dep. at 36: 9-14, Exhibit 2.)*

**GOVERNMENT'S RESPONSE: Denied**. The record material to which Defendant cites does not support the factual assertion made. The cited testimony of Mr. Everett demonstrates that Mr. Everett has no personal knowledge of the date on which the South Paris Tannery closed or the date on which the South Paris Tannery stopped using the sludge lagoons. This lack of personal knowledge is evidenced by the fact that Mr. Everett's answer to the question of when the pits closed is qualified by the term "I guess" and "As far as I know" and by the fact that, when asked how he knew when the pits closed, he responded logically that they "didn't have no reason to use them afterwards." Plaintiff's MSJ, Ex. JJJ, Everett Dep. at

36:9-11, 42:1-7. In addition, Mr. Everett did not remember the date on which the South Paris Tannery closed and when asked about that fact he stated, "I can't remember exactly because I wasn't here. I think I was in Michigan working." *Id.* As a contractor, Mr. Everett's experience at the South Paris Tannery was limited to a maximum of approximately 6-7 weeks during the 1960s. *Id.* at 41:11-25, 42:1-25. Mr. Everett was not employed by the South Paris Tannery at the time it closed and had "no idea" whether the tannery began sending its waste to the PUD at any point. *Id.* at 36:1-25.

In addition, the United States objects to this alleged fact on the basis of relevance, as explained herein in Plaintiff's General Objection ¶ 2. The specific dates on which sludge lagoons ceased accepting waste from the South Paris Tannery is an inquiry that is not relevant to the Liability Phase of this litigation. Further, the United States objects to this alleged facts because it is inconsistent with Defendant's allegations that the sludge lagoons ceased receiving waste in 1977 and 1979. Defendant's MSJ SOF, ECF No. 122-1 at ¶¶ 15, 16.

**COURT DETERMINATION**: **Denial accepted, fact rejected.** The deposition excerpts presented (ECF Nos. 122-4 and 128-4) reveal that Everett was guessing when the sludge lagoons ceased being used rather than offering a fact based on personal knowledge. His testimony does not provide an evidentiary foundation for the statement proposed.

---

**DSMF 19:** *A History of the Site prepared by Maine DEP provides: "The PUD continued to operate the Site with Lawrence's knowledge and consent, with Lawrence's contribution of industrial waste from 6/1/79 through 12/30/85." (History of Site, Exhibit 34.)*

**GOVERNMENT'S RESPONSE: Denied**. The record material to which Defendant cites does not support the assertion that the Lagoons Site continued to operate from June 1, 1979 through December 30, 1985. As discussed above in the United States' Objection to Defendant's SOF ¶ 16, Defendant's Exhibit 34 is relevant to the Landfill Site only and does not relate to the Lagoons Site that is the subject of this litigation. This is evidenced by the fact that Defendant's Exhibit 34 references "the disposal of sludges from the operation of [the PUD] at the subject Site," the "written agreement between PUD and A.C. Lawrence" under which PUD deposited sludge on A.C. Lawrence's property, and the possibility of depositing PUD's sludge on the Ryerson Hill Site, which was considered as an alternative to the Landfill Site for the disposal of PUD's waste. The United States objects to this alleged fact because it creates confusion between Lagoons Site, at issue in this case, and the Landfill Site, as explained herein in Plaintiff's General Objection ¶ 3.

**COURT DETERMINATION**: **Denial accepted, fact rejected.** The "site" referenced in the quoted statement refers to "a 24 acre parcel (Map R-2, # 14)

presently owned by A.C. Lawrence." History of Site (ECF No. 122-36). This is not the Lagoons Lot, which is an approximate seven-acre parcel identified as Lot 7 on the Paris, Maine property tax map R-2.

**DSMF 20**: *Since the waste lagoons had limited capacity, the sludge/solids in those waste lagoons had to be removed twice a year by Old Lawrence. P.E. Dunn was hired by Old Lawrence to clean the sludge/solids out the waste lagoons (14 pits total) on the Site twice a year. These are the same waste lagoons that comprised the Site. (Everett Dep. at 28:4-9, Exhibit 2; Barry Dep. at 139:7-11, Exhibit 11; Hennessy Dep. at 84:9-12, Exhibit 8; AECOM Expert Report, Exhibit 17; Interview Memo, Exhibit 36.)*

**GOVERNMENT'S RESPONSE**: Contrary to L.R. 56(b), this alleged fact asserts more than one factual allegation. As such, the United States asserts the following qualifications, admissions and denials:

**Denied**. The United States **denies** that there is information in the record to support the allegation that sludge was removed from the sludge lagoons at the Lagoons Site twice a year. The only document cited to support this alleged fact are notes of an unsworn interview of two unidentified former employees of P.E. Dunn, and Ms. Hennessy's deposition, which cites to that interview.

The additional citations offered by Defendant provide no further support. The cited portion of Mr. Everett's deposition states only that he had seen a contractor digging the pits out, but he did not know where the material went or when he saw that occur. Defendant's MSJ SOF, Ex. 2, ECF No. 122-4, Everett Dep. at 28:4-9. Likewise, the cited portion of Mr. Barry's testimony stands only for the proposition that he was told during an unsworn interview with a PUD employee that sludge in the sludge lagoons was periodically excavated. The AECOM report relays inadmissible hearsay regarding an alleged twice-annual excavation and does not offer a contemporaneous source of verification that is independent from the documents already cited herein. None of these documents or testimony states that any such digging or excavation removed 100% of the sludge waste from the Lagoons Site or removed any other particular volume of sludge waste.

The United States **objects** to this alleged fact on the basis of relevance, as explained herein in Plaintiff's General Objection ¶ 2. Details regarding the excavation of sludge from the sludge lagoons are not relevant to the Liability Phase of this litigation, because none of it supports the opinion or conclusion that no disposal occurred during the ownership or operation of the Lagoons Site by Swift & Company or Estech, Inc., as explained in Plaintiff's Motion *In Limine* to Exclude Testimony of Douglas Simmons and Craig MacPhee (ECF No. 118), and its supporting Reply brief filed June 3, 2013. In addition, as explained herein in Plaintiff's General Objection ¶ 7, the United States objects to the use of Defendant's

Exhibit 36, an unsworn interview, as the statements in these notes constitute inadmissible hearsay and should not be considered by the Court. If the Defendant wished to offer the testimony of a P.E. Dunn employee regarding the extent, frequency or duration of any excavation, it could have sought third-party discovery from P.E. Dunn or its employees or noticed the deposition of the interviewee. Further, the United States objects to this alleged fact because it is based on the opinion of two witnesses who have not yet been qualified to testify as experts in this case, as explained herein in Plaintiff's General Objection ¶ 6, and whose opinions are unreliable for the reasons set forth in Plaintiff's Motion *In Limine* to Exclude Testimony of Douglas Simmons and Craig MacPhee (ECF No. 118), and its supporting Reply brief filed herewith.

**COURT DETERMINATION**: **Denial accepted, objection sustained in part and overruled in part, fact as modified in dispute.** The EPA Interview Memo (ECF No. 122-38) is inadmissible hearsay, but its use may be proper within the AECOM Report (ECF No. 123-13). The memo records a conversation with a former P.E. Dunn employee. The interviewee's name is redacted, but it is clear that he drove a truck for P.E. Dunn and participated in the removal of dewatered sludge from the sludge lagoons during the late 1960's and early 1970's. According to this person, the sludge was removed from the lagoons and placed on the Landfill Site twice a year. The account of an individual with personal knowledge of Old Lawrence's practices are facts "reasonably relied upon" by experts. *See* Fed. R. Evid. 703.

The AECOM Report does not state that "P.E. Dunn was hired by Old Lawrence to clean the sludge/solids out the waste lagoons (14 pits total) on the Site twice a year," and this part of the asserted fact is stricken.

For the reasons stated in the Court Determination of PSMF ¶ 30, the Hennessy and Everett depositions fail to support the proposed fact. But the Government did not object to that portion of Barry's deposition (ECF. No. 122-13) in which he testified that John Barlow relayed to him that solids from the filled-up sludge lagoons would be transported to a different site for disposal, and this testimony also supports the proposed fact.

**DSMF 29:** *In December of 1978, Plaintiff wrote PUD concerning the poor quality of PUD's discharge to the River and PUD's consistent failure to meet its discharge limits into the River, including chromium. (Sheehan Letter Dec. 21, 1978, Exhibit 39.)*

**GOVERNMENT'S RESPONSE**: Contrary to L.R. 56(b), this alleged fact asserts more than one factual allegation. As such, the United States asserts the following qualifications, admissions and denials:

**Admitted**. The United States admits that Mr. Sheehan, of EPA's Municipal Facilities Branch, wrote to PUD on December 21, 1978 regarding PUD's failure to meet its license requirements.

**Denied**. The United States denies that there was a consistent failure to meet chromium discharge limits. The record material to which Defendant cites in support of that alleged fact does not mention chromium, nor does it support the allegation that PUD consistently failed to meet chromium discharge limits.

Further, the United States **objects** to this alleged fact on the basis of relevance, as explained herein in Plaintiff's General Objections ¶ 1. Whether PUD discharged chromium to the River is not relevant to the question of whether disposal occurred on the sludge lagoons at the time the Lagoons Site was owned or operated by Swift & Company or Estech, Inc.

**COURT DETERMINATION: Denial accepted, fact modified; objection overruled.** The Government asserts that this statement is irrelevant, but ConAgra claims this is evidence of the Government's involvement with PUD. The cited letter does not mention chromium levels and thus the last two words of DSMF ¶ 29 are stricken.

---

**DSMF 43:** *On April 26, 1993, the State of Maine, Board of Environmental Protection ("Maine BEP") and PUD, with the written approval of New Lawrence, stipulated and agreed to the terms of Consent Decree ("Consent Decree"). On April 26, 1993, the Superior Court for the State of Maine entered that Consent Decree and Order in a matter entitled <u>State of Maine and Board of Environmental Protection, Plaintiffs v. A.C. Lawrence Leather Co., Inc. and Paris Utility District, Defendants</u>. ("New Lawrence") at No. CV-88-373. The Consent Decree found in part:*

> *WHEREAS, from 1953 through 1985, Defendant A.C. Lawrence Leather Co., Inc. (New Lawrence) owned and operated a cattle hide tannery located in South Paris, Maine; and*

> *WHEREAS, pursuant to the operation of said tannery, Lawrence (New Lawrence) produced and discharged to the Little Androscoggin industrial waste water; and*

> *WHEREAS, from 1953 to 1975, Lawrence (New Lawrence) deposited waste water and sludge containing chromium and other waste from its tannery on part of a parcel of land owned by Lawrence and described as parcel 24…*

> *\*\*\**

*WHEREAS, pursuant to a written agreement with Lawrence's predecessor, the District secured the right to deposit sludge from the POTW on the Lawrence site…*

*(our emphasis) (1993 Consent Decree, Exhibit 10.)*

**GOVERNMENT'S RESPONSE: Qualified**. The United States **admits** that the State of Maine and the Board of Environmental Protection entered into a Consent Decree and Order with PUD in 1993 regarding the PUD's disposal of waste water and sludge on a parcel of land owned by A.C. Lawrence Leather Co., Inc. and described as Lot 24. The United States further admits that the quoted text is accurate, with the exception of the inaccurate abbreviations added to the Consent Decree language by the Defendant. However, the United States denies that New Lawrence, as defined by Defendant, owned or operated the South Paris Tannery from 1953 through 1985. The Consent Decree uses "Lawrence" as shorthand for A.C. Lawrence Leather Co., Inc., the company that owned the South Paris Tannery at the time of the Consent Decree. However, Defendant has inserted an abbreviation to reflect "New Lawrence." The distinction between Lawrence, the abbreviation used by the parties to the Consent Decree and the Court to mean, generally, the entity that historically operated the tannery and owned the Landfill Site, and New Lawrence, the term used by Defendant as shorthand for A.C. Lawrence Leather Co., Inc., is of great significance. In fact, A.C. Lawrence Leather Co. Inc. was only incorporated in on October 7, 1975 just prior to its acquisition of the South Paris Tannery from Estech, Inc. Plaintiff's MSJ, Ex. VVV, MA Secretary Filing, at 1. Therefore, it could not have owned and operated the South Paris Tannery from 1953 through 1985. It appears that the Consent Decree's drafters may have unintentionally attributed the entire history of the South Paris Tannery's operation to A.C. Lawrence Leather Co., Inc., or, in Defendant's terms, "New Lawrence," rather than separately noting that the South Paris Tannery operated as the A.C. Lawrence Leather Company division prior to 1976. This error likely occurred because the difference between the A.C. Lawrence Leather Company division and A.C. Lawrence Leather Co., Inc. was not an issue of any importance to the resolution of the Consent Decree. Furthermore, the United States objects to this alleged fact on the basis of relevance, as explained herein in Plaintiff's General Objections ¶¶ 1, 2.

**COURT DETERMINATION: Qualification accepted.** The Court will consider the actual consent decree.

**DSMF 53:** *Prior to entry of the Consent Decree, Plaintiff notified PUD: "we are aware that Maine BEP and PUD are negotiating an Administrative Consent Agreement and the Maine BEP has sent a proposed agreement to the District. We (Plaintiff) have reviewed a copy of this proposed agreement and conclude that it will*

*satisfy our requirement that an appropriate enforcement action be taken against the District to eliminate its permit violations. Unless the Maine BEP and the District can enter into an administrative consent order by August 17, EPA (Plaintiff) will have to proceed with its own administrative order. EPA (Plaintiff) will notify the District of the terms of its administrative order if a Consent Agreement with Maine BEP is not concluded."*

**GOVERNMENT'S RESPONSE: Qualified**. The United States admits that the quoted language accurately reflects the text of Defendant's Exhibit 42, a letter sent from David A. Fierra, Director of EPA, Region I's Water Management Division, to the Paris Utilities District Board of Trustees on August 2, 1984, with the exception of parenthetical information, which has been added by Defendant, and the substitution of BEP in place of DEP. This letter relates to an administrative consent order to be entered into regarding PUD's NPDES permit violations, as evidenced by the reference to NPDES Permit No. ME0100951 within the subject line of Defendant's Exhibit 42, and as discussed in the Plaintiff's Opposition to Defendant's Statement of Fact 32, this letter relates to an administrative consent order. This letter does not relate to the Consent Decree entered between the Paris Utilities District and the State of Maine in 1993 regarding the Landfill Site. Any language within Defendant's Exhibit 42 regarding EPA's receipt and review of a proposed agreement relates only to PUD's compliance with its discharge limits under the Clean Water Act and does not relate to the 1993 Consent Decree regarding the Landfill Site.

The United States **objects** to this alleged fact on the basis of relevance. Plaintiff's communications with PUD regarding PUD's NPDES permit violations is not relevant to this litigation, as explained herein in Plaintiff's General Objection ¶ 1. Furthermore, as noted herein in Plaintiff's General Objection ¶ 5, the United States objects to the Defendant's substitution of BEP in place of DEP. The document cited by Defendant to support this Statement of Fact references negotiations between DEP and PUD, not BEP and PUD.

**COURT DETERMINATION: Qualification accepted, fact modified; objection overruled**. Although the Government points out that this letter, written on August 2, 1984, relates to NPDES permit violations and not to the eventual 1993 consent decree, it is relevant to the extent it shows the relationship between the Government and MEDEP. This is relevant to the issue of whether the 1993 consent decree has any preclusive effect on the issues in this case.

**DSMF 91:** *Instead of digging up the soil at the Site and hauling it to a landfill, one solution for the Site would have been to just stabilize the river bank and cover the exposed area.*

**DSMF 92:** *To prevent human exposure to soil at the Site, Plaintiff could have simply*

*built a fence. To prevent human exposure to groundwater, a deed restriction could have been filed against the property.*

**DSMF 108:** *On March 5, 1976, Estech, Inc. sold to A.C. Lawrence Leather Co., Inc. (New Lawrence) whereby New Lawrence purchased every asset located at the South Paris Tannery in South Paris, Maine, and assumed all debts, liabilities, obligations and commitments, whether fixed, contingent, accrued or otherwise of Estech, Inc.*

**GOVERNMENT RESPONSE: Qualified**. The United States **admits** that in or around March 5, 1976, Estech, Inc. sold a portion of the business, real property and assets of the A.C. Lawrence Leather Company division to a group of the division's management and employees, who separately incorporated the company as New Lawrence. Plaintiff's MSJ SOF, ECF No. 116-1, at ¶¶ 4, 50, 51. The United States **denies** that New Lawrence assumed assume all debts, liabilities, obligations and commitments of Estech, Inc. The 1976 Agreement between Estech, Inc. and A.C. Lawrence Leather Co., Inc. provides that A.C. Lawrence Leather Co., Inc. will assume certain liabilities and obligations and then states "[b]uyer shall be under no obligation to assume any other obligation, liability or indebtedness of ACL." Defendant MSJ SOF, Ex. 75, ECF No. 122-77, at p. 11. Estech, Inc., also agreed to indemnify A.C. Lawrence Leather Co., Inc. for any "loss or damage" suffered by A.C. Lawrence Leather Co., Inc. as a result of any assertion against it by any government agency for liabilities that A.C. Lawrence Leather Co., Inc. did not expressly assume and were accrued by Estech, Inc., prior to the closing of the sale. *See id.* Contrary to what Defendant asserts, A.C. Lawrence Leather Co., Inc. took on a limited number of liabilities and the remaining universe of liabilities, including CERLCA liability, was excluded. *Id.*

Further, the United States **objects** to this alleged fact on the basis of relevance. However, the United States objects to this alleged fact on the basis of relevance. Whether there may be other entities that are also liable to the United States for response costs at the Site is not relevant to the Liability Phase of this litigation, as explained in Plaintiff's General Objection ¶ 2.

**COURT DETERMINATION: Objection sustained.** This statement is not relevant to liability.

**DSMF 109:** *On March 5, 1976, Estech, Inc. and New Lawrence also entered into an Assumption Agreement ("Assumption"). New Lawrence assumed all debts, liabilities, obligations and commitments, whether fixed, contingent, accrued or otherwise, of Estech, Inc. which occurred in the ordinary course of its business, excepting only, liabilities defined as "Excluded Liabilities." None of the "Excluded Liabilities" referenced in the Assumption in any way pertain to the South Paris Tannery, its operations, its environmental issues, its environmental discharges, waste or sludge disposal, or CERCLA liability.*

GOVERNMENT RESPONSE: Qualified. The United States admits that on March 5, 1976, Estech, Inc. and New Lawrence, as defined by Defendant, entered into an Assumption Agreement. The United States denies that New Lawrence assumed all debts, liabilities, obligations and commitments, whether fixed, contingent, accrued or otherwise, of Estech, Inc. which occurred in the ordinary course of its business, excepting only, liabilities defined as "Excluded Liabilities." The liabilities assumed by New Lawrence are specifically enumerated, with reference to the 1976 Sale Agreement. Defendant's Exhibit 77, ECF No. 122-80, at 1. The United States denies that there is material in the record to support the factual allegation that none of the "Excluded Liabilities" pertain to the South Paris Tannery, its operations, its environmental issues, its environmental discharges, waste or sludge disposal, or CERCLA liability. As further explained herein in Plaintiff's Opposition to Defendant's Statement of Fact 108, A.C. Lawrence Leather Co., Inc. assumed a limited number of liabilities, and the remaining universe of liabilities, including CERLCA liability, remained with Estech, Inc.

Further, the United States objects to this alleged fact on the basis of relevance. Whether there may be other entities that are also liable to the United States for response costs at the Site is not relevant to the Liability Phase of this litigation, as explained in Plaintiff's General Objection ¶ 2.

COURT DETERMINATION: Objection sustained. This statement is not relevant to liability.

DSMF 110: *An integral part of the purchase of Old Lawrence, by New Lawrence was a Memorandum of Agreement ("MOA") entered into between PUD and Estech, Inc. also on March 5, 1976. The MOA set forth rights and responsibilities of the parties with respect to the financing, construction, operation and maintenance of a treatment facility. The MOA provides, in pertinent part, that PUD will finance, construct, operate and maintain such facility a cost, estimated in March of 1976, to be approximately $6,695,000. The PUD believed in early 1976 that it would be eligible to receive federal and state financing equivalent to 85% of the total cost and that PUD would promptly make application for those funds. When construction was complete, PUD agreed to treat all sewage and waste generated by Old Lawrence. The MOA provided that Estech, Inc. would allow PUD to deposit chromium laced waste sludge from its to be constructed treatment facility on A.C. Lawrence property. In return, PUD would indemnify, save and hold Estech, Inc. harmless from and against any and all liabilities and claims arising out of the sludge disposal activities conducted by PUD on Estech, Inc.'s premises.*

GOVERNMENT'S RESPONSE: Contrary to L.R. 56(b), this Statement of Material Fact asserts more than one fact. As such, the United States asserts the following qualifications, admissions and denials:

**Denied**. The United States denies that the 1976 Memorandum of Agreement ("1976 MOA") between PUD and Estech, Inc., was an integral part of the purchase of certain assets of Estech, Inc.'s A.C. Lawrence Leather Company division by A.C. Lawrence Leather Co. Inc.

**Qualified**. The United States **admits** that the 1976 MOA recited the rights and responsibilities of the PUD and Estech, Inc., with respect to the financing, construction, operation and maintenance of the PUD treatment facility. The United States **denies** that such rights and responsibilities were set forth for the first time in the 1976 MOA. The rights and responsibilities of PUD and Estech, Inc., with respect to the financing, construction, operation and maintenance of the PUD treatment facility were also set forth in a July 3, 1973 Agreement between Estech, Inc. and PUD. Plaintiff's MSJ, Ex. FFFF, July 3, 1973 Memorandum of Agreement, ACL_PUD000157. The 1976 MOA was an amendment to the 1973 Agreement between PUD and Estech, Inc. Plaintiff's MSJ, Ex. GGGG, Letter from Hickman to Barber, at ACL_PUD001705. The 1973 Agreement was an amendment to prior Agreements between PUD and Swift & Company, dated December 3, 1970, and October 13, 1972. Defendant's Exhibit 78, ECF No. 122-81, at ACL_EPA053276.

**Qualified**. The United States **admits** that the 1976 MOA provides in pertinent part that PUD will finance, construct, operate and maintain such facility. However, the United States denies that the cost estimate of approximately $6,695,000 was made in March of 1976. That estimation was dated March of 1975. Defendant's Exhibit 78, ECF No. 122-81, at ACL_EOA053264-267. Additionally, previous estimates were made in April of 1970, July of 1972 and January of 1973. Plaintiff's MSJ, Ex. FFFF, July 3, 1973 Memorandum of Agreement, ACL_PUD000157-158.

**Admitted**. The United States **admits** that the PUD believed in early 1976 that it would be or already was eligible to receive federal and state financing equivalent to 85% of the total cost. PUD submitted an EPA/State Grant application for Joint Wastewater Treatment Facility in January 1973. Plaintiff's MSJ, Ex. EE, ECF No. 116-1.

**Qualified**. The United States **admits** that, upon the completion of construction, PUD agreed to treat sewage and waste generated by A.C. Lawrence Leather Company division, and later, A.C. Lawrence Leather Co., Inc., not to exceed 1.25 M.G.D.

**Qualified**. The United States **admits** that, in accordance with the 1973 Agreement and 1976 MOA, PUD was permitted to deposit waste sludge generated by PUD on the Landfill Site. Plaintiff's MSJ SOF, ECF No. 116-1, at ¶ 32; Defendant's Exhibit 78, ECF No. 122-81, at ACL_EPA053277.

**Qualified**. The United States **admits** that, in accordance with the 1976 MOA, PUD agreed to indemnify, save and hold Estech, Inc. harmless from and against any and all liabilities and claims arising out of the sludge disposal activities conducted by PUD on the Landfill Site. Defendant's Exhibit 78, ECF No. 122-81, at ACL_EPA053277. The United States denies that this purported indemnity arrangement applied to the Lagoons Site. Further, the United States **objects** to this alleged fact on the basis of relevance, as explained in Plaintiff's General Objection ¶ 1. These facts are not relevant to this litigation.

**COURT DETERMINATION: Objection sustained.** This statement is not relevant to liability.

---

**DSMF 111:** *Exhibit III to the "Assumption" was a notice to creditors which provides in part:*

> *that Estech, Inc. has sold a large portion of Old Lawrence, headquartered in Peabody, Massachusetts, to a corporation owned by senior management of Old Lawrence on March 5, 1976, and that New Lawrence has assumed all of the debts, including your accounts with Old Lawrence.*

**GOVERNMENT'S RESPONSE: Qualified**. The United States **admits** that a document labeled "Exhibit III" appears to be an undated and unsigned notice to customers of the South Paris Tannery, which provides in pertinent part that

> Estech, Inc…. has sold a large portion of its division known as A.C. Lawrence Leather Company…to a corporation owned by senior management of the A.C. Lawrence division of March 5, 1976. That firm, which shall be known as A.C. Lawrence Leather Co., Inc., has assumed all of the debts, including your account, of Estech, Inc.'s A.C. Lawrence Leather Company division as part of that acquisition.

Defendant's Exhibit 77, ECF No. 122-80, at CHP000529.

The United States **denies**, however, that there is any information to indicate that this document was an exhibit to the March 5, 1976 Assumption Agreement between A.C. Lawrence Leather Co., Inc. and Estech, Inc. Further, the United States **objects** to this alleged fact on the basis of relevance, as explained in Plaintiff's General Objection ¶ 1. These facts are not relevant to this litigation.

**COURT DETERMINATION: Objection sustained.** This statement is not relevant to liability.

---

**DSMF 113:** *On November 17, 1976, Plaintiff wrote to PUD that the Environmental Protection Agency (Plaintiff) is carrying out an environmental impact statement on*

*sludge disposal alternatives for the South Paris Maine Wastewater Treatment Facility (PUD). The Plaintiff was planning a public workshop to present its findings and seeks the District's (PUD) opinion "in selecting disposal alternatives for detained study during the next phase of analysis." (our emphasis)* (Stickney Letter, Exhibit 80.)

**GOVERNMENT'S RESPONSE: Admitted**. However, the United States **objects** to this alleged fact on the basis of relevance. That the EPA sought public involvement in selecting sludge disposal alternatives for PUD is not relevant to this litigation, as explained herein in Plaintiff's General Objection ¶ 1.

**COURT DETERMINATION: Objection overruled.** Fact admitted for purposes of establishing background relevant to ConAgra's preclusion claims.

**DSMF 123:** *ConAgra Grocery Products Company, LLC was originally established as a Delaware corporation on June 21, 2000 with the name CAG Acquisition SUB, Inc. The company's name was changed to International Home Foods, Inc. on August 24, 2000, and then further changed to ConAgra Grocery Products Company on December 31, 2000. The company converted from a Delaware corporation to a Delaware limited liability company on May 29, 2005.*

**GOVERNMENT'S RESPONSE: Admitted and Objection**. The United States **admits** that Defendant has accurately quoted from its Exhibit 83, but **objects** to this fact on the basis that it is not relevant to the claims or defenses in this matter, as explained herein in Plaintiff's General Objection ¶ 1. The United States has set forth the relevant steps connecting Estech, Inc. and Defendant in its Motion for Summary Judgment.

**COURT DETERMINATION: Objection overruled.** This statement useful to establishing ConAgra's corporate history.

## GOVERNMENT'S ADDITIONAL FACTS

**PASMF 4:** *A.C. Lawrence Leather Co. Inc. was incorporated on October 7, 1975 just prior to its acquisition of the South Paris Tannery from Estech, Inc. Plaintiff's MSJ, Ex. VVV, MA Secretary Filing, at 1.*

**CONAGRA'S RESPONSE: Denied**. "A.C. Lawrence Leather Co. Inc." was never incorporated. (Plaintiff's MSJ Ex. VVV) On October 7, 1975, New Lawrence, Inc. was incorporated.

**COURT DETERMINATION: Denial rejected, but fact restated to conform precisely to the cited record.** The cited record (ECF No. 128-16), the authenticity

of which ConAgra does not dispute, indicates that New Lawrence incorporated in Massachusetts in 1975 under the name New Lawrence, Inc., and changed its corporate name to A.C. Lawrence Leather Co., Inc. on March 2, 1976.



APPENDIX B MAP
This map depicts a portion of the Paris, Maine property tax maps, with color and text boxes added by the defendant in *U.S. v. Conagra Grocery Products, Co., LLC*, Case No. 2:11-cv-455-NT (D. Me.). It is incorporated into the Court's order on the parties' cross-motions for summary judgment solely to aid the reader in visualizing the approximate locations of the lots and businesses referenced in this case. It does not have any determinative or preclusive effect on matters to be decided in this case.